No. 11-3211
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT
_____

REGINA DANIELS,

Plaintiff-Appellant,

v.

UNITED PARCEL SERVICE, INC.,

Defendant-Appellee.
_____

Appeal from the United States District Court for the District of Kansas
(Civil No. 09-CV-2304-JAR)
The Honorable Julie A. Robinson
United States District Court Judge
_____

**APPELLANT'S OPENING BRIEF**
_____

Dennis E. Egan
POPHAM LAW FIRM
712 Broadway, Suite 100
Kansas City, MO 64105
(816) 399-5202

Fredrick D. Deay, II
LAW OFFICES OF FREDRICK D. DEAY, II
7575 W. 106th Street, No. 14
Overland Park, KS 66212
(913) 649-0687

Attorneys for Plaintiff-Appellant

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Table of Contents.................................................................................................. i

Table of Authorities ............................................................................................. ii

Statement of Related Cases ............................................................................... vii

Jurisdictional Statement ....................................................................................... 1

Statement of Issues Presented for Review.......................................................... 2

Statement of Case ................................................................................................. 3

Statement of Facts ................................................................................................ 4

Summary of Argument ....................................................................................... 15

Argument ............................................................................................................ 17

Conclusion .......................................................................................................... 51

Oral Argument Requested .................................................................................. 52

Certificate of Compliance................................................................................... 54

Certificate of Digital Submissions..................................................................... 54

Certificate of Service .......................................................................................... 55

# TABLE OF AUTHORITIES

## Cases

Almond v. Unified School Dist. No. 501, 2010 WL 4384206 (D.Kan. Oct. 28, 2010).... 23

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ..................................................... 17

Argo v. Blue Cross & Blue Shield of Kansas, Inc., 452 F.3d 1193(10th Cir. 2006) ........ 43

Ashley v. Boyle's Famous Corned Beef Co., 66 F. 3d 164(8th Cir. 1995)(en banc) ......... 39

Beaird v. Seagate Technology, Inc., 145 F. 3d 1159 (10th Cir. 1998)............................... 29

Brinkley-Obu v. Hughes Training, Inc., 36 F. 3d 336 (4th Cir. 1994)............................... 39

Burlington Northern and Santa Fe Ry. Co. v. White, 547 U.S. 53 (2006)........................ 42

Bush v. Orange County Corr. Department, 597 F. Supp. 2d 1293 (M.D. Fla. 2009) ....... 38

Cada v. Baxter Healthcare Corp., 920 F.2d 446 (7th Cir. 1990)....................................... 22

Cardenas v. Massey, 269 F. 3d 251(3rd Cir. 2001) ........................................................... 39

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .................................................................. 17

County of Washington v. Gunther, 452 U.S. 161 (1981)................................................... 33

David v. Monsanto Chemical Co., 858 F.2d 345(6th Cir. 1988) ....................................... 47

Davidson v. Am. Online, Inc., 337 F.3d 1179 (10th Cir. 2003)........................................ 23

Doebele v. Sprint/United Mgm't Co., 342 F.3d 1117 (10th Cir. 2003)............................. 28

Duchon v. Cajon Co., 791 F. 2d 43 (6th Cir. 1986) .......................................................... 51

Edwards v. Hodel, 738 F.Supp. 426 (D.Colo.1990) ......................................................... 28

Edwards v. Lujan, 40 F.3d 1152 (10th Cir.1994).............................................................. 28

E.E.O.C. v. Bd. of Governors of State Colleges & Univ., 957 F.2d 424 (7th Cir. 1992) . 51

E.E.O.C. v. FedEx, 513 F.3d 360 (4th Cir. 2008) ............................................................ 28

E.E.O.C. v. Horizon/CMS Healthcare Corp., 220 F.3d 1184 (10th Cir. 2000) ......... 18, 36

E.E.O.C. v. Metal Serv. Co., 892 F.2d 341 (3d Cir.1990) ........................................... 34, 36

E.E.O.C. v. White & Son Enter., 881 F.2d 1006 (11th Cir.1989) .................................... 33

Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509 (3d Cir.1992).................. 27

Fischbach v. District of Columbia Dept. of Corrections, 86 F.3d 1180 (D.C.Cir.1996) .. 30

Forsyth v. Federation Employment and Guidance Serv., 409 F. 3d 565 (2nd Cir. 2005).. 39

Furnco Construction Corp. v. Waters, 438 U.S. 567 (1978) .............................................. 36

Garrett v. Hewlett-Packard Co., 305 F.3d 1210 (10th Cir.2002) ..................................... 29

Geleta v. Gray, 645 F.3d 408 (D.C. Cir. 2011) ................................................................. 24

Gentry v. Jackson State University, 2009 WL 1097818 (S.D. Miss. 2009) ..................... 38

Gibbs v. Pierce County Law Enforcement Support Agency, 785 F. 2d 1396 (9th Cir. 1986). ..................................................................................................................................... 39

Gilmore v. Macy's Retail Holdings, 2009 WL 305045 (D.N.J. 2009) ............................. 38

Ginger v. District of Columbia, 527 F.3d 1340 (D.C. Cir. 2008) ..................................... 24

Goodwin v. General Motors Corp., 275 F. 3d 1005 (10th Cir. 2002)................................ 39

Haney v. Preston, No. 08-2658, 2010 WL 5392670 (D. Kan. Dec. 22, 2010). ............... 45

Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993) ............................................................... 46

Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215 (10th Cir.2006) ............................... 43

Hernandez v. Data Systems Intern., Inc., 266 F. Supp. 2d 1285 (D.Kan. 2003) ............. 28

Hildebrandt v. Illinois Dept. of Natural Resources, 347 F. 3d 1014 (7th Cir. 2003)......... 39

Holtz v. Marcus Theatres Corp., 31 F.Supp.2d 1139 (E.D.Wis.1999) ............................ 28

Hysten v. Burlington N. & Santa Fe R.R. Co., 296 F.3d 1177 (10th Cir. 2002) ....... 19, 34

International Brotherhood of Teamsters v. United States, 431 U.S. 324 (1977) ............. 36

Jackson v. University of Pittsburgh, 826 F.2d 230 (3d Cir.1987).................................... 27

Jeffries v. Kansas, 147 F.3d 1220 (10th Cir.1998)........................................................... 17

Johnson v. Palma, 931 F.2d 203 (2d Cir. 1991) ............................................................... 51

Kenworthy v. Conoco, Inc., 979 F.2d 1462 (10th Cir.1992) ........................................... 36

Klindt v. Honeywell Intern. Inc., 303 F. Supp. 2d 1206 (D.Kan. 2004) .......................... 40

Kuebel v. Black & Decker, 643 F.3d 352 (2d Cir. 2011) ................................................. 49

Ledbetter v. Goodyear Tire & Rubber Co., Inc., 127 S. Ct. 2162 (2007)........................ 39

Lewis v. City of Chicago, 130 S.Ct. 2191 (2010) ....................................................... 22, 23

Lewis v. Sch. Dist #70, 523 F.3d 730 (7th Cir 2008) ...................................................... 28

Marlow v. Chesterfield County School Bd., 749 F. Supp. 2d 417 (E.D. Va. 2010) ......... 24

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ............. 17

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) ............................................... 19

McInerney v. United Air Lines, Inc., 2011 WL 1350453 (10th Cir. Apr. 11, 2011).. 49, 50

Meeks v. Computer Assoc. Int'l, 15 F.3d 1013 (11th Cir.1994) ....................................... 34

Mehus v. Emporia State Univ., 222 F.R.D. 455 (D. Kan. 2004) ...................................... 34

Merrill v. Cintas Corp., 941 F.Supp. 1040 (D.Kan.1996).................................................. 33

Mickelson v. New York Life Ins. Co., 460 F. 3d 1304 (10th Cir. 2006).................... 19, 27

Mikula v. Allegheny County of Pa., 583 F. 3d 181(3rd Cir. 2009) .................................. 38

iv

Millea v. Metro-North R.R. Co., No. 10-409, 2011 WL 3437513 (2d Cir. Aug. 8, 2011)50

Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518 (11th Cir.1992) ................. 33

National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002) ...................... passim.

Owens v. Sprint/United Management Co., 333 F. Supp. 2d 1094 (D.Kan. 2004) ........... 24

Pardo–Kronemann v. Donovan, 601 F.3d 599 (D.C.Cir.2010) ......................................... 44

Plotke v. White, 405 F.3d 1092 (10th Cir. 2005) .................................................. 17, 18, 28

Rattigan v. Holder, 643 F.3d 975 (D.C. Cir. 2011) .......................................................... 44

Rea v. Martin Marietta Corp., 29 F.3d 1450 (10th Cir.1994) ..................................... 19, 27

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000) ........................ 18, 29

Rehman v. State University of New York at Stony Brook, 596 F.Supp.2d 643 (E.D. NY 2009) .................................................................................................................................... 38

Richards v. Eldorado National Co., 2004 U.S. Dist. LEXIS 21205 (D.Kan. 2004) ........ 32

Shea v. Rice, 409 F. 3d 448 (D.C. Cir. 2005) ................................................................... 39

Simms v. Okla. ex rel Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321 (10th Cir. 1999) ................................................................................................................. 17

Spees v. James Marine, Inc., 617 F. 3d 380 (6th Cir. 2010) ............................................ 24

Sprague v. Thorn Americas, Inc., 129 F.3d 1355 (10th Cir.1997) .............................. 33, 34

Steele v. Kroenke Sports Enters., LLC, 264 F. App'x 735 (10th Cir. 2010) .................... 46

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993) ....................................................... 18

Stinnett v. Safeway, Inc., 337 F.3d 1213 (10th Cir. 2003) ......................................... 17, 24

Sturgill v. United Parcel Serv., Inc., 512 F.3d 1024 (8th Cir. 2008) ................................ 47

v

Stubbs v. Regents of University of California, 2007 WL 1532148 (E.D. Cal. May 25, 2007) ................................................................................................................ 28

Thomas v. International Business Machines, 48 F.3d 478 (10th Cir.1995) ...................... 17

Turrentine v. United Parcel Service, Inc., 645 F. Supp. 2d 976  (D.Kan. 2009) .............. 48

Wells v. Colo. Dept. of Transp., 325 F.3d 1205 (10th Cir. 2006) ............................. 19, 27

Williams v. W.D. Sports, N.M., Inc., 497 F.3d 1079 (10th Cir. 2007) ...................... 44, 47

Windon Third Oil and Gas v. Federal Deposit Ins., 805 F.2d 342 (10th Cir.1986), cert. denied, 480 U.S. 947(1987) ................................................................................ 17

Zamora v. Elite Logistics, Inc., 478 F.3d 1160 (10th Cir.2007)  ...................................... 29

## Statutes and Regulations

29 U.S.C. § 623 (a),(b)  ......................................................................................... 19, 31

42 U.S.C. § 2000e–2 (a),(d)  .................................................................................... 19, 31

42 U.S.C. § 2000e-3(a). ............................................................................................... 41

Pub. L. No. 111-2, 123 Stat. 5 (2009) ..................................................................... 37, 38

Fed.R.Civ.P. 56(c) ........................................................................................................ 17

Fed.R.Evid. 801(d)(2).  ................................................................................................ 30

## Other Authorities

2 EEOC Compliance Manual, Section 8, Retaliation, Chapter II, Part D, § 1 (May 20, 1998) .......................................................................................................................... 50

2 EEOC Compliance Manual, Section 10, Compensation Discrimination (December 5, 2000) ................................................................................. 34

## **STATEMENT OF RELATED CASES**

There are no prior or related cases or appeals.

## <u>JURISDICTIONAL STATEMENT</u>

Plaintiff-Appellant Regina Daniels filed her Complaint in Kansas Federal District Court alleging: sex and age discrimination and retaliation in violation of Title VII, the ADEA, and related Kansas law; unequal pay under the EPA; and, also, breach of contract/promissory estoppel, pursuant to Kansas common law.  App. 1, 34.  The district court had jurisdiction under 28 U.S.C. §§ 1331, 1332, 1343, and 1367.  *Id.*

On June 24, 2011, the district court granted UPS's Motion for Summary Judgment and entered final Judgment in favor of UPS as to all Ms. Daniels' claims.  App. 1774.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291, because this is an appeal from a final judgment of the district court.   Plaintiff's Notice of Appeal was timely filed.  App. 1828.

## <u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

1.      Whether the district court erred in concluding that Ms. Daniels failed to establish a prima facie case of sex and age discrimination in connection with her Title VII and ADEA classification, pay, position removal, training denial, and promotion claims.

2.      Whether the district court erred in concluding that Ms. Daniels failed to establish a prima facie case in connection with her Title VII and ADEA retaliation claims.

3.      Whether the district court erred in its interpretation and application of the Supreme Court *Morgan* decision, the Ledbetter Fair Pay Act, and the futile gesture doctrine in finding Ms. Daniels' promotion and training denial claims untimely.

4.      Whether the district court erred in failing to properly recognize and consider the substantial evidence which Ms. Daniels submitted in support of all her claims and theories.

5.      Whether the district court erroneously evaluated the evidence in a manner contrary to mandated summary judgment standards.

## <u>STATEMENT OF THE CASE</u>

This is an employment case in which Plaintiff-Appellant Regina Daniels ("Plaintiff" or "Ms. Daniels") filed suit against Defendant-Appellee United Parcel Service, Inc. ("Defendant" or "UPS") alleging: sex and age discrimination and retaliation in violation of Title VII, the ADEA, and related Kansas law; unequal pay under the EPA; and, also, breach of contract/promissory estoppel, pursuant to Kansas common law. App. 1-18.  Ms. Daniels filed her Complaint on June 11, 2009.  *Id.*

On December 1, 2010, UPS filed its Motion for Summary Judgment.  App. 77, 83. Ms. Daniels filed her Memorandum in Opposition on January 26, 2011.  App. 671.  UPS filed its Reply on March 25, 2011.  App. 1243.  On June 24, 2011, the district court entered its Memorandum and Order granting UPS's Motion for Summary Judgment; the Judgment was entered the same day.  App. 1774, 1827.  This appeal followed, with Ms. Daniels timely filing her Notice of Appeal on July 21, 2011.  App. 1828.

## STATEMENT OF FACTS

Plaintiff-Appellant Ms. Regina Daniels ("Ms. Daniels" or "Plaintiff") began working for Defendant-Appellee United Parcel Service, Inc. ("UPS" or "Defendant") in 1984 and retired in 2009, at the age of 57.  App. 35, 942, 1784.  Her last position was full-time night window dispatcher at the UPS Kansas City, Kansas (James Street) Feeder Department.  App. 779, 783, 942.  Ms. Daniels continuously held the position of full-time cover dispatch specialist ("cover dispatcher") for five years – from 2004 to 2008.  App. 779, 783, 909.  Feeder drivers at UPS drive tractor trailer trucks with packages between UPS facilities. App. 1784.  As a feeder dispatch specialist, plaintiff worked dispatching tractor trailer drivers with their loads, among other tasks.  *Id*. As the cover dispatcher, Ms. Daniels' job was to perform the many varied duties of each of the three dispatch specialist positions on the day, night, and twilight shifts or "windows" when there was an absence, due to vacation or otherwise.  App. 780-82, 791, 795-99, 823, 883, 1785.  Each dispatch position or shift has very different duties and responsibilities and the schedules for these jobs are very different.  App. 972-76, 1083, 1785.

Although Ms. Daniels' position was classified and she was compensated as a non-supervisor, Ms. Daniels routinely performed the duties of a full-time feeder supervisor.  App. 780-84, 791, 783-84, 791, 795-99, 823, 890.  As the cover dispatcher, although she was already performing some twilight shift duties and began on-the-job training to cover the twilight window full-time, one week into her twilight window training, UPS instituted a policy that only full-time supervisors, *all of whom were male,* would be allowed to work (or train) on the twilight window.  App. 783-90, 792, 888.  There have never been

any full-time female supervisors or managers in the James Street Feeder Department.

App. 893, 2171.  Ms. Daniels' was training was abruptly ended. App. 783-90, 792, 888.

**Without Notice to Ms. Daniels, UPS Stripped Her Cover Position and Awarded It to A Younger Male During Ms. Daniels' Vacation.**

UPS needed to hire a full-time night dispatcher.  App. 957, 1091.  Ms. Daniels covered that position on extended assignment until in July 2008, she was removed as cover dispatcher and assigned night shift full time.  App. 820, 822, 869, 963-64, 957. Ms. Daniels had told Feeder management that covering the night shift for an extended period was very disruptive to her, particularly, working Sunday and holiday nights, that it did not allow her to attend to personal obligations during normal daylight hours and that it forced her to miss important family events.  App. 868-69, 956-57, 1073, 1091.

On July 9, 2008, with no prior notice to Ms. Daniels and while she was on vacation, UPS clandestinely promoted Jason Isabell to dispatch specialist and awarded him Ms. Daniels' cover dispatch job.  App. 820, 822, 963-64.  Ms. Daniels suffered significantly different, and substantially diminished, job responsibilities and opportunities for advancement, as well as the biologically unnatural overnight shift.  App. 972-76, 1083, 1785.  Ms. Daniels was permanently relegated to the night dispatch job until she retired.  App. 820.

Ms. Daniels was never informed by UPS that it was interviewing to replace her in the cover position.  App. 820, 842-27, 963-64.  At UPS's direction, Feeder Department Manager Joe Dooley interviewed one female for Ms. Daniels' cover position, Ms. Cindy Holt, before promoting Mr. Isabell. App. 841, 845-46.  Ms. Holt had no interest in the

cover position and concluded she had been required to interview so UPS could "cover their butts." App. 841, 842-47. Mr. Dooley told Ms. Holt during her "interview," that he already had someone else in mind to replace Ms. Daniels in the cover position. App. 841, 842-47.

**Contrary to Its Policy, UPS Provided Twilight Window Training and Experience to Jason Isabell – a Non-Supervisor and the Younger Male Who Replaced Ms. Daniels.**

Before and up until the time Jason Isabell was promoted to a full-time specialist and given Ms. Daniels' cover dispatch job (i.e., in 2008), UPS provided Mr. Isabell – *who was not a full-time supervisor* – continuous on-the-job training, supervision, and experience on the twilight window and, permitted him to perform the duties of the twilight dispatch window. App. 784, 793, 888. This was a clear violation of UPS's rule forbidding anyone except full-time supervisors from working on the twilight window. App. 784, 793, 888.

**Ms. Daniels Had Greater Dispatcher Knowledge and Experience Than Jason Isabell and She Was the Best Qualified Individual for the Cover Dispatch Position.**

Ms. Daniels had more experience than Mr. Isabell, she knew how to and had covered all three dispatch shifts, she was best qualified to hold the cover position, and she should have been allowed to acquire any additional twilight experience that was provided to Mr. Isabell. App. 780-82, 791, 795-99, 823, 884, 887-88. Ms. Daniels was fully capable of performing all the duties of the twilight window unsupervised if she had been provided with the same on-the-job training, experience, supervision, and assistance opportunities that UPS provided the younger, less-experienced Mr. Isabell  in 2008, in

6

clear violation of the rule that only full-time supervisors could work the twilight window. App. 783-86, 788-90.

**Although Ms. Daniels Position Was Classified and Compensated by UPS as Non-Supervisory, Ms. Daniels Was Performing the Duties of a Supervisor.**

Ms. Daniels' position at UPS was classified as a "dispatch specialist," which UPS considered to be an entry level management position below the level of a full-time supervisor. App. 1784. Full-time supervisors receive greater compensation and other economic benefits, including participation in the "MIP" program (i.e., UPS stock), than dispatchers or specialists, such as Ms. Daniels. App. 945. However, Ms. Daniels, as well as other specialists, regularly performed the same duties as the full-time supervisors. App. 780-84, 791, 783-84, 791, 795-99, 823, 890, 895-97. Ms. Daniels filled in for supervisors who were absent or on vacation. App. 799. Ms. Daniels and other dispatch specialists trained, supervised, evaluated, and disciplined drivers. App. 781, 846-47, 895-97, 1115. In annual EEO-1 submissions to the EEOC, UPS designated dispatch specialists as "Officials and Managers." App. 2174-86, 2187-90.

UPS considered reclassifying the night and cover dispatch positions as supervisory but chose not to do so because it would increase labor costs. App. 853, 1091. After he listened to Ms. Daniels describe just some of her actual job duties, former UPS Kansas District Human Resources Manager Gary Liberti asked Ms. Daniels why her position was not classified as MIP or supervisory. App. 823, 846-47, 969. UPS management, including Mr. Liberti, already knew that the specialists were upset about performing

supervisory work  without being compensated as supervisors.  App. 896-97.  UPS did not

address specialist misclassification or compensation.  App. 896-97.

**Ms. Daniels Makes Internal Complaint of Discrimination and Retaliation and Asks For Confirmation of UPS Promotion Policies and Procedures.**

Ms. Daniels met with UPS Kansas District Human Resources Manager, Mr.

Liberti, on July 31, 2008, and expressly stated she believed she was being discriminated

against based on her sex and age and retaliated against because: she had been removed

from her cover position and replaced by Mr. Isabell; she had continuously been denied

the twilight window on-the job training that UPS provided to Mr. Isabell in 2008; she was

relegated to the night dispatch window position, and, she had complained about Mr.

Dooley coming to her home and posting a note on her door.  App. 816-17, 819-24, 842-

47, 963-64, 966, 968-69.  Further, Ms. Daniels asked Mr. Liberti to confirm the UPS

promotion process. She asked whether UPS policy required management to conduct a

follow-up interview with her after she applied for promotion, because, she told him, UPS

had never responded to her applications.   App. 816-17, 819-24, 842-47, 963-64, 966,

968-69.  Mr. Liberti told her UPS promotion policy required a follow-up interview, but

admitted management had not been forwarding promotion applications and paperwork to

human resources, in violation of the written policy.  App. 816-17, 819-24.

Ms. Daniels position was referred to as OMS – operations *management* specialist.

App. 780.  Specialist jobs were created by UPS "to take some of the responsibility off of

the full-time supervisors." App. 780.  Ms. Daniels supervised and dispatched drivers and

carried out her dispatch duties in a supervisory capacity.   App. 781.   Plaintiff also

supervised administrative employees.  App. 781.  During Ms. Daniels' July 2008 meeting

with Mr. Liberti, wherein she complained of sex and age discrimination, Mr. Liberti

asked Ms. Daniels what her responsibilities were.  App. 823, 846-47.  She told him: two

administrative people; dispatch mileage and local drivers; hot overflows; breakdowns;

call-ins; and, the preload sort.  Mr. Liberti then asked her if she had shifters; she said yes,

"I'm responsible for the preload sort."  *Id*.  He then asked her which MIP person was

there during the sort.  *Id*.  Ms. Daniels laughed and said none, never has been; "it's just

me and only me.  I'm responsible for the sort."  *Id*.  Mr. Liberti then asked her, "Well,

why isn't that window MIP?"  *Id*.  Ms. Daniels said, "I don't know, you tell me."  App.

823, 846-47.

Mr. Liberti then pledged to Ms. Daniels that he would do three things: look into

her complaint;  talk to Joe Dooley (Feeder Manager) and Ernie Christie (Division Feeder

Manager); and, they would have a meeting and he would follow-up with her.  App. 823,

847.  Pursuant to written UPS policy, Mr. Liberti-UPS was required to "vigorously and

thoroughly" investigate Ms. Daniels' complaint and promptly follow-up with her.  App.

1025, 2191.

**Contrary to UPS Policy and Mr. Liberti's Assurances, UPS Never Did Anything in Response to Ms. Daniels' Discrimination and Retaliation Complaint; Ms. Daniels Contacted the EEOC, Completed an Intake Questionnaire, and Filed a Charge of Discrimination.**

"No one followed up with plaintiff about her July 31, 2008 meeting." App. 1789.

Mr. Dooley told Ms. Daniels that Mr. Liberti had never talked to him about her July 2008

discrimination complaint.  App. 828, 849-51.  Ms. Daniels completed an EEOC intake

questionnaire in August 2008, and filed an EEOC Charge on November 21, 2008.  App.

962, 966.  Ms. Daniels  suddenly experienced a dramatic decrease in Mr. Dooley's daily

supervisory or advisory e-mails and voicemails, which interfered with and impeded her

ability to do her job.  App. 827, 830.  "She noticed a *significant* decrease in *business*

communication from [her supervisor] Dooley."  App. 1789. (emphasis added).  UPS

proffered no nondiscriminatory reason for Mr. Dooley's abrupt refusal to inform Ms.

Daniels of business information required for her job.

**The Male Dominated James Street Feeder Department Openly Condoned Sex Discrimination.**

On January 13, 2009, James Street Feeder Supervisor Scott Wetschensky used the

UPS email system to send Feeder Supervisor, Jim Yankovich, and other male employees,

including Jason Isabell, a four-page email entitled: "THE MAN RULES" which

disparaged women, including stating that women need to keep their problems and

concerns to themselves.  App. 958-61.  Sending this type of email is prohibited by the

UPS Professional Conduct and Anti-Harassment Policy.  App. 1112.  UPS took no

disciplinary action against any of the men who sent this email.  App. 1092-94. Mr.

Dooley claimed he did not know if the email was sexually discriminatory.  App. 1092-94,

1112.

**In an Unprecedented Occurrence, UPS Management Falsely Accused Ms. Daniels of The Terminable Offense of Defrauding the Company By "Stealing Time."**

Ms. Daniels and other employees were routinely forced to work through their

shifts without taking a break or lunch, which resulted in discrepancies between scheduled

and recorded work times, including, after the end of a full shift, leaving before their

scheduled time.  App. 818, 852, 895, 1110-11.  UPS management was fully aware of this. App. 818, 852, 895, 1110-11. On February 18, 2009, Ms. Daniels's manager Joe Dooley told her that he had heard she filed a charge of discrimination with the EEOC; Mr. Dooley than told Ms. Daniels she was being investigated by UPS security for not recording her time properly.  App. 833-34, 849-51, 1113.

Ms. Daniels was next directed to attend a meeting on February 26, 2009 with the Kansas District Human Resources Manager Gary Liberti and District Employee Relations Manager Brad Williams; this was unprecedented.  App. 813-14, 831-32, 968-69.  At that meeting, Ms. Daniels told Mr. Liberti neither he nor anyone ever reported back to her about the discrimination complaint she made to him in July 2008, and that she had filed a charge of discrimination with the EEOC.  App. 831-32, 968-69.  Mr. Liberti first denied Ms. Daniels had made a discrimination complaint to him, then claimed he had talked to Mr. Dooley about Ms. Daniels' complaint and had asked Mr. Dooley to follow up with Ms. Daniels.  App. 831-32, 968-69.  Mr. Liberti then falsely accused Ms. Daniels of fraud and theft – i.e., improperly recording her time.  App. 831-32, 968-69.  During the course of this meeting, Mr. Liberti was threateningly slapping Ms. Daniels' EEOC intake questionnaire in his hand and angrily yelling at Ms. Daniels, "Well, do you want me to get the EEOC down here!?" App. 831-32, 968-69.

**Ms. Daniels Is Falsely Accused of Time Card Fraud at the Same Time UPS Is Forcing Ms. Daniels and Others to Work Through Breaks and Inaccurately Record Their Times.**

Mr. Liberti falsely accused Ms. Daniels of improper time card recordation, telling her she needed to "properly" record her time, meals, and breaks and accused her of

intentionally misrepresenting her meal and break times and leaving early while remaining on the clock.  App. 813-14, 817-18.  However, UPS routinely forced employees to work through their breaks, although working a full shift, which resulted in discrepancies between employees' scheduled and recorded times.  App. 817-18, 852, 895, 1110-11. Nonetheless, UPS sent Ms. Daniels and others email directing them to _always_ record lunch and break times, regardless of whether she took lunch or breaks, which she was neither able nor permitted by her supervisor to do.  App. 1111.  However, this management directive contradicted another written order from UPS management to Ms. Daniels which stated there should be _very few_ times one would not be able to take a lunch or break.  App. 1110.

**Ms. Daniels Is Recommended for and Repeatedly Applies for Promotion to Supervisor and, Contrary to UPS Policy, Receives No Response.**

Although Ms. Daniels was already performing supervisory duties, her former Feeder Manager, Mic Haynes, recommended Ms. Daniels for, and stated she should have been promoted to, full-time supervisor or MIP in 2005.  App. 885-86, 888.  Ms. Daniels twice properly submitted applications and materials for promotion to a full-time supervisor position in 2005 and 2006.  App. 800, 803, 842-47, 873, 875, 1076.  However, contrary to written policy, UPS did not process her applications and did not meet or follow-up with her and never told Ms. Daniels the status of her promotion applications. App. 800, 803, 842-47, 873, 875, 1076.   Mr. Haynes twice submitted Plaintiff's promotional paperwork to Human Resources, including hand delivering such to former Kansas District Human Resources Manager Jim Grover.  App. 882, 886.  UPS claims it

has no record of, did not receive, or lost Plaintiff's promotional paperwork. App. 882, 886. UPS never met or followed-up with Plaintiff to discuss her promotion applications in 2005 and 2006. App. 800-01, 842-45.

UPS has admitted it promoted employees to full-time supervisor positions in the Kansas District in 2005 and 2006 and there were applicants being interviewed and considered for promotion to full-time supervisory positions in the Kansas District during that period – the same time Plaintiff had submitted her promotion application materials. App. 98, 902-03, 923-24, 2172-73.

After UPS failed or refused to follow-up or meet with Ms. Daniels regarding her promotion applications and learning, in 2007, that her promotion packet and assessment that had been sent to Joe Dooley had not been completed, Ms. Daniels believed it was a futile gesture to apply for or submit any further materials for promotion. App. 802-05, 807.

**UPS Admittedly Did Not Comply With Its Promotion Policies and Procedures, Knowingly Refused to Process Ms. Daniels' Promotion Applications, and Deliberately Failed to Investigate Her Discrimination Complaint.**

UPS managers and supervisors must follow UPS's policies and do not have the authority to change or disregard any of the company's policies. App. 1020. UPS's mandatory written promotion policy, the Management Assessment and Promotion Process ("MAPP") was instituted in 2005, but UPS admitted the MAPP was not consistently applied, and that it was violated with respect to Ms. Daniels' attempts to be considered for promotion. App. 94, 800, 803, 1057, 1077. Ms. Daniels was already well-qualified for promotion in 2005 and 2006. App. 882, 886. Under the MAPP

procedure, the candidate submits a promotion request, then must wait for UPS to follow-up. App. 2220-22. The MAPP requires that the employee's manager meet with the promotion candidate, discuss the application, and obtain signed forms from the candidate *prior* to UPS making any promotion qualification decision. App. 2222. Ms. Daniels' manager, Mr. Dooley, did not complete Ms. Daniels' assessment, did not forward her application to HR, and did not meet with Ms. Daniels. App. 802-05, 807.

## SUMMARY OF ARGUMENT

The district court's order granting summary judgment to UPS should be reversed. The district court erred in failing to properly evaluate the record evidence as mandated under Supreme Court and Tenth Circuit precedents – in its totality, in context, in the light most favorable to Ms. Daniels, and drawing all reasonable inferences therefrom in her favor. The district court erroneously ignored and weighed evidence in concluding that the discrimination and retaliation against Ms. Daniels was not "meaningful" and she could not establish the prima facie elements of her claims or pretext.

The district court erred in concluding that Ms. Daniels did not experience an adverse employment action when – unannounced and while she was on vacation – she was removed from the cover dispatch position she held for 5 years, and replaced by a younger, less experienced male who, in violation of UPS policy, received training and experience she was denied, resulting in Ms. Daniels being permanently placed in a night shift with significantly less responsibilities and opportunities and after she had repeatedly told management she did not want to be placed in the night position full time and that working nights prevented her from attending to personal and family obligations.

The district court also erroneously ignored and assessed the record evidence demonstrating Ms. Daniels was discriminated against with respect to her job classification, compensation, and other economic benefits. The district court erred as a matter of law when it concluded that Ms. Daniels, who held a unique position, was required to prove that her position and duties were identical to a male supervisor or manager. There was compelling evidence demonstrating Ms. Daniels, although not

15

classified as such, was performing supervisory duties and, because of her sex and age, she was denied promotion. The district court improperly disregarded this evidence and simply accepted UPS's contradictory, post-hoc version of events.

The district court erred in finding Ms. Daniels' promotion and training claims were untimely and that an employment practice or decision regarding a promotion to a position with greater pay and other economic benefits is not a "compensation related" decision. Likewise, the lower court erred in its interpretation of the *Morgan* decision and Ledbetter Fair Pay Act and their scope and application to the facts of this case.

The district court committed plain error in ignoring the substantial evidence of pretext and concluding plaintiff may only utilize pretext evidence at certain stages of her case. There was abundant evidence demonstrating UPS's contradictory, inconsistent, post-hoc assertions were false and unworthy of belief. The district erred in ignoring evidence of UPS's brazen admissions it was not complying with its policies, the company's ongoing misrepresentations to the EEOC, and the open and condoned sex discrimination within the department Ms. Daniels worked in.

The district court failed to utilize the proper retaliation standard in concluding that a reasonable person in Ms. Daniels circumstances, after making a charge of discrimination, being falsely accused of timekeeping fraud, experiencing a substantial decrease in important business communications from her manager, and who, contrary to UPS policy, never heard anything back from UPS after making an internal complaint of discrimination, would not be dissuaded from pursuing a charge of discrimination. The controlling law required that this decision be left to the jury.

# ARGUMENT

## I.    Standard of Review.

This court reviews an order granting summary judgment de novo.  *Simms v. Okla. ex rel Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). The Court of Appeals must apply the same standard of review as that required of the district court. *Id.*  The Court must view the facts in the light most favorable to the non-movant, draw all reasonable inferences in favor of the non-moving party, make no credibility determinations, and weigh no evidence.[1]  *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Thomas v. International Business Machines*, 48 F.3d 478, 484 (10th Cir.1995).  The nonmovant is to be given "wide berth to prove a factual controversy exists." *Jeffries v. Kansas*, 147 F.3d 1220, 1228 (10th Cir.1998).  Summary judgment may only be granted where there is no genuine dispute as to any material fact; the evidence must be such that no reasonable jury could find in favor of the nonmoving party.  Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  With respect to testimony from UPS management, the "court should give credence to the evidence favoring the

---

[1] As stated in *Plotke v. White*, 405 F.3d 1092, 1093-94 (10th Cir. 2005), "[i]n applying this standard, "[a]ll inferences arising from the record before us must be drawn and indulged in favor of the [nonmovant]." *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir. 2003) (internal quotations omitted). "Credibility determinations [and] the weighing of the evidence . . . are jury functions, not those of a judge . . . ." *Id.* (internal quotations omitted).  A summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir.1986), cert. denied, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791(1987).

17

nonmovant as well as that "evidence supporting the moving party that is *uncontradicted and unimpeached*, at least **to the extent that that evidence comes from disinterested witnesses**." in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000). (emphasis added).    If no genuine issue of material fact is in dispute, the Court of Appeals, in reviewing a grant of summary judgment, must determine whether the substantive law was correctly applied by the district court. *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).

## II.    Ms. Daniels Established Timely Prima Facie Claims of Sex and/or Age Discrimination.

Ms. Daniels alleged that because of her sex and/or age UPS discriminated against her when it (1) removed her from her cover dispatch position and permanently assigned her to the graveyard shift; (2) denied her the on-the-job training it provided to the younger man who replaced her; (3) failed to promote her and denied her promotional opportunities; and, (4) misclassified her position, resulting in her receiving less pay and other economic benefits.  App. 37-41.  Plaintiff's prima facie burden is not great.  *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005).  Establishing a prima facie case creates a presumption of unlawful discrimination.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

As to each claim, Ms. Daniels demonstrated a prima facie case by showing that (1) she belongs to a protected class; (2) she was treated differently and less favorably in employment opportunities on the basis of her protected classification (i.e., she suffered an adverse employment action); and (3) the adverse employment action occurred under

circumstances which give rise to an inference of discrimination.  *See Hysten v. Burlington N. & Santa Fe R.R. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002).

Pretext evidence is properly considered at multiple stages of Ms. Daniels' claims. *Mickelson v. New York Life Ins. Co.*, 460 F. 3d 1304, 1316-17 (10th Cir. 2006) (*quoting Wells v. Colo. Dept. of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2006).  Ms. Daniels is required to be given a full and fair opportunity to show pretext by establishing either that a discriminatory reason more likely motivated UPS's conduct, or that UPS's explanations are unworthy of credence.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804-05 (1973); *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir.1994).

### A. Ms. Daniels Was Denied the On-the-Job Training and Experience UPS Provided to Mr. Isabell, Both Over a Period of Years As A Matter of Policy, and Specifically and Intentionally in 2006 and 2008.

Denial of equal opportunities for training on the basis of sex or age is an adverse employment action expressly prohibited by law.  *See* 42 U.S.C. § 2000e–2 (a), (d) (Title VII); 29 U.S.C. § 623 (a), (b) (ADEA).  In 2008, within 300 days of her EEOC filing, Ms. Daniels was specifically denied the on-the-job twilight training UPS admittedly provided to Mr. Isabell before he was promoted in July.  App. 784, 793, 820, 822, 888, 963-64.  The district court asserted, "Denial of training is a discrete act….," before erroneously concluding Ms. Daniels was only denied training in 2005 or 2006 and that her discriminatory denial of training claim was untimely.  App. 1803.

When Ms. Daniels began on-the-job training on the twilight shift, UPS management suddenly instituted a policy that only full-time supervisors could work the twilight shift, including a prohibition of on-the-job training on the twilight shift.  App.

784, 793, 888.  As a result, Ms. Daniels' training was cancelled. Thereafter pursuant to

UPS's policy, she was not permitted to receive twilight training, both over a period of

years, and specifically in 2008, when Mr. Isabell, *who was not a full-time supervisor*, was

provided with this on-the-job training and experience.  The district court erred as a matter

of fact in concluding Ms. Daniels was denied training only in 2005 or 2006. As the

Supreme Court explained in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101

(2002):

> The existence of past acts and the employee's prior knowledge of their
> occurrence, however, does not bar employees from filing charges about
> related discrete acts so long as the acts are *independently* discriminatory
> and charges addressing those acts are themselves timely filed. Nor does the
> statute bar an employee from using the prior acts as background evidence in
> support of a timely claim.

> *Id.* at 113.  (emphasis added).

The court below also found evidence of the "inexorable zero" – "[t]here [were

and] are no full-time female supervisors or managers in the James Street feeder

department." App. 1785.  The court utterly ignored the significance of this fact when

coupled with the policy that only full-time supervisors could work the twilight dispatch:

If only men are full-time supervisors, and only full-time supervisors can work the twilight

shift, including working it as on-the-job training, then UPS's policy is that only men can

work the twilight shift. A jury could reasonably conclude that because a significantly

younger man drastically less-experienced than Ms. Daniels, who was not a full-time

supervisor, was permitted to work the twilight shift, this was because of his sex and/or

age.  Ms. Daniels' claim that she was denied the training Mr. Isabell was provided in 2008 because of her sex or age should be remanded for trial.

### B. Ms. Daniels' Evidence Established Her Claim That UPS Had a Policy of Sex Discrimination in Training, Which was Timely as a Matter of Law.

Ms. Daniels alleged the discrimination UPS subjected her to was part of a pattern or practice of discrimination.  App. 1, 9, 11, 34, 37, 40, 784, 793, 888, 1795.  The district court erred as a matter of law in refusing to permit her pattern or practice training discrimination claim to be tried, in contravention of *Morgan*.  The court below concluded a failure to train claim could only be a discrete act under *Morgan*.  App. 1803.  However, UPS's discriminatory policy, pattern or practice of denying on-the-job twilight training to women adversely affected Ms. Daniels within the 300-days before she filed her EEOC Charge, a claim *Morgan* did not bar.

*Morgan* did not alter the existing law on the application of the continuing violations doctrine to pattern-or-practice claims, "We have no occasion here to consider the timely filing question with respect to 'pattern-or-practice' claims brought by private litigants as none are at issue here." *Morgan*, 536 U.S. at 115 n.9.  Discriminatory acts, like repeated harassment that creates a hostile work environment, that are part of a pattern or practice of discrimination can be challenged as a single claim.  If the discriminatory pattern or practice continues into the filing period, all of the component acts of the pattern or practice will be timely, and relief can be recovered for any of those acts.  *Morgan* did not address "the question of how Title VII's filing deadlines should be applied to pattern-

or-practice claims based on a series of discriminatory acts, some of which occurred outside the limitations period." *Id.*

### C. Under *Morgan*, Ms. Daniels' Claim That UPS Discriminated Against Her When Her Twilight Training Was Revoked is Timely.

In *Morgan*, the Supreme Court recognized, although "[w]e have repeatedly made clear that although [Title VII] mentions specific employment decisions with *immediate consequences*," the law is not limited to such claims. *Id.* at 115. (emphasis added). The general rule is, "the plaintiff may not base a suit on *individual acts* that occurred outside the statute of limitations," with the exception, "*unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct*."[2] *Id.* at 117-18. (emphasis added). Just recently, the Supreme Court made clear it does not agree with those claiming its earlier cases stand for the proposition that present effects of prior actions can never lead to Title VII liability. *Lewis v. City of Chicago*, 130 S.Ct. 2191, 2199 (2010).

With respect to Ms. Daniels' revocation of training claim, her surreptitious removal from her cover position was not an immediate consequence of UPS's earlier revocation of her on-the-job training; being removed from her position was a discriminatory act distinct from the 2008 training discrimination. It is incorrect as a

---

[2] Courts applying the judicial discovery rule have held that the filing period begins to run when the plaintiff discovers the ultimate employment decision itself (e.g., when the plaintiff learns that he was terminated or that he was not hired); not the time of the act which brought such about. *See, e.g., Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990). Thus, as applied by the courts, under the discovery rule, the start of the filing period is delayed until the discriminatory nature of the decision at issue is discovered. *Id.*

matter of law, unreasonable and unjust to hold that Ms. Daniels should have filed a charge when UPS's "full-time supervisors only" policy was enacted and her training was ended; she could not have known at that time that the absence of completed twilight training would be alleged as the reason for her demotion to night dispatcher years later. The finding of the district court that in order for an employee to preserve a claim he or she must file a charge of discrimination at the time *and* every time something unfavorable happens in the workplace – regardless of any knowledge of discriminatory conduct – is problematic. Indeed, in *Lewis*, the Supreme Court found such an approach questionable. *Lewis*, 130 S.Ct. 2200.

On this issue (and concerning the application of the Lily Ledbetter Fair Pay Act ("FPA") discussed below), the district court relied heavily on the decisions in *Davidson v. Am. Online, Inc.*, 337 F.3d 1179 (10th Cir. 2003), and *Almond v. Unified School Dist. No. 501*, No. 07-4064, 2010 WL 4384206 (D.Kan. Oct. 28, 2010). App. 1796-99, 1802. Those opinions, involving factual scenarios very different from that herein, reflect narrow and misguided interpretations of the *Morgan* decision and the FPA and do not control that present in this case.

The Supreme Court in *Morgan* expressly stated:

There may be circumstances where it will be difficult to determine when the time period should begin to run. One issue that may arise in such circumstances is whether the time begins to run when the injury occurs as opposed to when the injury reasonably should have been discovered. But *this case presents no occasion to resolve that issue*.

*Id.*, at 115 n.7. (emphasis added).

23

Accordingly, pursuant to *Morgan*, Ms. Daniels' revocation of training claim was timely.

### III. Ms. Daniels' Removal As Cover Dispatcher and Permanent Reassignment To the Night Window Position Was an Adverse Employment Action Which Resulted in Decreased Responsibilities, Diminished Opportunities, Less Prestige, and a Permanently Disruptive Sleep and Social Schedule.

The district court correctly recognized Ms. Daniels' working hours and job duties were drastically changed, but erred in failing to apply the law, both that such a negative change can constitute a discriminatory adverse employment action, and that this issue is to be decided by a jury. *Owens v. Sprint/United Management Co.*, 333 F. Supp. 2d 1094, 1100 (D.Kan. 2004) (denying summary judgment; "a jury, not the court, must determine whether plaintiff's reassignment to the special projects position was an adverse employment action as that phrase has been interpreted by the Tenth Circuit."). A jury may find a reassignment is an adverse employment action, "when the employee has less responsibility in the new assignment or is required to use a lesser degree of skill than his or her previous assignment." *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir.2003).[3] The court below erred in failing to credit the record evidence in holding, "plaintiff has not pointed to any evidence to suggest an *objective* advantage to the cover

---

[3] *See, e.g., Spees v. James Marine, Inc.*, 617 F. 3d 380, 392 (6th Cir. 2010) (involuntary transfer of pregnant employee to less demanding job, without reduction in pay or benefits); *Marlow v. Chesterfield County School Bd.*, 749 F. Supp. 2d 417, 430 (E.D. Va. 2010) (reassignment to duties encompassed in former job description); *Ginger v. District of Columbia*, 527 F.3d 1340, 1344 (D.C. Cir. 2008)(shift change causing disruption in sleep schedule). *See also Geleta v. Gray*, 645 F.3d 408 (D.C. Cir. 2011)(retaliatory transfer to position with narrower, less important responsibilities may be materially adverse).

dispatch position compared to the night dispatch position," (App. 1807)(emphasis added), and misconstrued and improperly weighed the evidence to conclude that Ms. Daniels' removal as the cover dispatcher "did not *meaningfully*" change her job responsibilities. App. 1806. (emphasis added).

Ms. Daniels produced objective evidence that the cover position was worlds away from the night shift in prestige, working conditions, and development and advancement opportunities, and it was required to be performed at night, some of which the court below acknowledged. The worker who can perform a number of very different jobs necessarily has more skills and experience and resultant job security. Dispatch specialists were "assigned to work one of the three dispatch windows, or as a cover dispatcher." App. 1806.  The cover dispatch specialist "fills in for absences and vacations on [all] the dispatch windows," including the most complex twilight position. App. 1785.  The district court found that "these windows have different duties and responsibilities and the hours are much different," and further, that the twilight shift is, "busier and more difficult." App. 1785.  Paradoxically, when a young man was promoted into Ms. Daniels' cover dispatch position, while she was reassigned to the less demanding, less prestigious, dead-end night shift, the lower court opined, "her job responsibilities did not *meaningfully* change," and concluded Ms. Daniels could not persuade a jury that she suffered an adverse employment action under all the attendant circumstances.  App. 1785, 1806-07.  (emphasis added).  This decision should be reversed.

In addition to the district court's own factual findings, Ms. Daniels and her former manager testified the person holding the cover dispatch position had to possess a broader

skill set than someone who worked only a single shift, was more valuable to the company, enjoyed more opportunities to be exposed to new and different skills and experiences, had greater opportunities to interact with a variety of managers, and, therefore, the cover position was clearly objectively more desirable than the night shift – both professionally and personally.  App. 780-82, 791, 795-99, 823, 883-84, 846-47, 868-69, 884-88, 956-57, 1073, 1091, 1785.

Moreover, it is common sense that even if two jobs are identical, reasonable people may find the graveyard shift meaningfully less desirable. Unless required to remain awake, workers customarily sleep at night, while most major social events occur during daylight hours and weekends (e.g., weddings, birthdays, graduations). Workers assigned to the night shift are required to use vacation days to attend these activities. Ms. Daniels told UPS management she wanted to perform her cover job and not the night shift for these reasons.  App.  868-69, 956-57, 1073, 1091.  The district court's recognition that Ms. Daniels' job duties were significantly changed, coupled with its opinion that the weight of that change to a reasonable worker in her shoes could not be "meaningful," impermissibly invaded the province of the jury.

The district court also failed to credit the evidence that *UPS itself argued the jobs were so meaningfully different that it required a full-time supervisor to perform the twilight part of the cover job*, and UPS argued that it installed the better worker, Mr. Isabell, in the cover position while Ms. Daniels' lesser skills only qualified her for the night shift.  An employer cannot deny women training and experience provided to males and then, deny job opportunities to women based on a lack of training and experience; a

defendant shown to have done so cannot meet its burden of production under the second step of the *McDonnell-Douglas* analysis, because discrimination is not a legitimate non-discriminatory explanation.[4]

UPS asserted Mr. Isabell was given Ms. Daniels' cover job because he was more qualified, and that he was more qualified because could cover the twilight job; yet, he could cover the twilight job only because of UPS's discriminatory act in providing him on-the-job twilight training in violation of UPS policy.  UPS's circular explanation for its more favorable treatment of Mr. Isabell, which ultimately ends with the inevitable admission that it violated its own policy to favor him, is evidence of discriminatory intent.  Evidence that the employer's explanation for its actions is untrue or unworthy of belief as to the true reason for an adverse action, or pretext evidence, is properly considered at multiple stages of plaintiff's claims, including establishing the prima facie case.  *Mickelson v. New York Life Ins. Co.*, 460 F. 3d 1304, 1316-17 (10th Cir. 2006) (*quoting Wells v. Colo. Dept. of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2006).  Plaintiff must be given an opportunity to show pretext by establishing either that a discriminatory reason more likely motivated defendant to deny an equal employment opportunity, or that defendant's explanations are unworthy of credence.  *Rea v. Martin Marietta Corp.*, 29

---

[4] *See Jackson v. University of Pittsburgh*, 826 F.2d 230, 235 (3d Cir.1987), *cert. denied*, 484 U.S. 1020 (1988) (employer's discrimination preventing employee from receiving training and support creates reasonable inference employee was treated less favorably than his colleagues which could explain any claimed performance deficiency). *See, e.g., also Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 540-542-43 (3d Cir.,1992)(evidence employer denies women "equal opportunities to ... training and support" that prevents them from gaining exposure to the projects or experience that would qualify them for promotions supports inference of discrimination).

F.3d 1450, 1455 (10th Cir.1994).  All doubts concerning pretext must be resolved in the plaintiff's favor.  *Doebele v. Sprint/United Mgm't Co.*, 342 F.3d 1117, 1135-39 (10th Cir. 2003).

This evidence "raises a possible inference that this criterion may have been a post hoc justification for discrimination."[5]  *See Hernandez v. Data Systems Intern., Inc.*, 266 F. Supp. 2d 1285, 1304 (D.Kan. 2003) (*citing Edwards v. Hodel*, 738 F.Supp. 426, 428 (D.Colo.1990), *aff'd as modified, Edwards v. Lujan*, 40 F.3d 1152 (10th Cir.1994) (finding discrimination where only non-Blacks were given extra training provided by temporary assignments to other positions, which "eliminat[ed] any chance of advancement by Blacks."); *Holtz v. Marcus Theatres Corp.*, 31 F.Supp.2d 1139, 1150-51 (E.D.Wis.1999) (denying summary judgment on failure to promote claim where only limited group allowed to receive training necessary for advancement).   UPS's contradictory, inconsistent, post-hoc explanations regarding twilight training denied Ms. Daniels and provided to a younger male who was not a full-time supervisor are probative evidence of discriminatory intent.  *See, e.g., Plotke v. White*, 405 F. 3d 1092, 1102-03 (10th Cir. 2005).

---

[5] Numerous courts have recognized such evidence raises a reasonable inference of discrimination.  *See, e.g., Lewis v. Sch. Dist #70*, 523 F.3d 730 (7th Cir 2008) (employer's creation of problem for which it terminated employee is evidence of discriminatory motive); *EEOC v. FedEx*, 513 F.3d 360 (4th Cir. 2008)(failure to provide training and then using absence of training as basis for termination); *Stubbs v. Regents of University of California*, 2007 WL 1532148 (E.D. Cal. May 25, 2007)(same); *Edwards v. Hodel*, 738 F.Supp. 426 (D.Colo 1990)(employee attempt to be promoted denied by employer on basis of absence of necessary training where training denied to employee on discriminatory basis).

The district court also failed to consider the totality of the evidence of discriminatory intent when it ignored additional evidence of the condoned, overtly discriminatory conduct taking place in the Feeder Department – right after Ms. Daniels filed her charge of discrimination. In January 2009, in flagrant violation of written UPS policy, the all-male supervisors in the James Street Feeder Department circulated an email disparaging women entitled, "THE MAN RULES," which expressed the belief that women should be subservient and not complain. App. 720-21, 735, 958-61, 1092-94, 1112. A district court cannot "disregard critical evidence favorable to the [plaintiff] – namely, the evidence supporting the [plaintiff's] prima facie case and undermining [defendant's] nondiscriminatory explanation." *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 152 (2000) (citations omitted). Discrediting the evidence in this way required the court to "impermissibly substitute[] its judgment concerning the weight of the evidence for the jury's." *Id*. at 153. The court below failed even to mention this evidence of the discriminatory work environment and the condoned retaliation as background evidence for analyzing the sex discrimination and retaliation claims.

The district also improperly failed to credit Ms. Daniels with UPS's unexplained admissions that it did not follow its promotion and other policies and procedures, which may be credited as evidence of discriminatory intent. *See, e.g., Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1191 (10th Cir.2007) (pretext may be established by evidence that the defendant acted contrary to company practice with respect to plaintiff); *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1220 (10th Cir.2002) (deviations from normal company procedure can support finding of pretext). *See also Beaird v. Seagate*

29

*Technology, Inc.*, 145 F. 3d 1159, 1168, 1174 (10th Cir. 1998).  As one court noted, "if the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so." *Fischbach v. District of Columbia Dept. of Corrections*, 86 F.3d 1180, 1183 (D.C.Cir.1996)

The district court also disregarded the evidence that when UPS James Street Feeder manager Joe Dooley interviewed Ms. Cindy Holt for Ms. Daniels' cover position, Mr. Dooley told Ms. Holt he already had someone else in mind as "double hearsay." App. 1787.  Ms. Holt's telling Ms. Daniels she had not expressed any interest in the position and felt Mr. Dooley was just trying to "cover his butt" is clearly admissible. App. 841, 845-46.  Mr. Dooley's statement to Ms. Holt is an admission and not hearsay under Fed.R.Evid. 801(d)(2).  Further, Ms. Holt's report to Ms. Daniels is also not hearsay because the content of the report of Mr. Dooley's intent is relevant for the effect of that report on Ms. Daniels, regardless of whether it was true that Mr. Dooley was only interviewing the disinterested Ms. Holt to create a false record of following an objective hiring process, or whether he had pre-selected Mr. Isabell.  A sham promotional process where a disinterested woman is interviewed for show and the pre-selection of a man for a job already held by a woman is strong evidence of discriminatory intent that the jury would be entitled to credit, together with the balance of the evidence.

   **IV.   Ms. Daniels Was Performing Supervisory Duties, Her Position Was Not Classified as Supervisory Because of Her Sex and/or Age, and This Discriminatory Classification Resulted in Her Being Denied Greater Compensation and Other Economic Benefits Provided to the All Male Supervisors in Her Department.**

The ADEA and Title VII expressly prohibit employment discrimination, including classifications, pay related or otherwise, based on age and sex. 29 U.S.C. § 623 (a) (1) and (2) and 42 U.S.C. § 2000e–2 (a) (1) and (2). The lower court found as a matter of fact, that UPS considers the dispatch specialist position, "an entry-level management position," and that Ms. Daniels and another female dispatcher, "did perform supervisory duties." App. 1784-85. UPS annually reported to the EEOC that Ms. Daniels position was supervisory or managerial. App. 2174-86, 2187-90. Discriminatory classification and compensation has repeatedly been brought to the attention of UPS management and the company has taken no action, prompt, effective, or otherwise, to correct it. App. 896-97 . UPS admits it was not familiar with all the duties Ms. Daniels actually performed; in fact, Joe Dooley – the James Street Feeder Manager – claimed he was unaware Ms. Daniels held the cover position. App. 1787. Likewise, after Ms. Daniels described just some of her work duties to the HR Manager Mr. Liberti, he mockingly replied, "Well, why isn't that window [position] MIP [supervisory]?" App. 823, 846-47, 1789. Ms. Daniels and other dispatchers did train, supervise, and discipline other employees. 781, 846-47, 895-97, 1115. Although, UPS has JBAs or job descriptions for the day, twilight, and night windows, it has no job description for the cover position Ms. Daniels held, or the feeder supervisor position. App. 972-76, 1087. The district court erred in concluding Mr. Liberti's statement to Ms. Daniels would not support an inference of discriminatory misclassification. App. 1812.

This evidence would allow a rational jury to conclude that Ms. Daniels was performing the work of a supervisor, but that her position was knowingly misclassified in

a discriminatory fashion which caused her to receive less favorable compensation and other economic benefits. *Richards v. Eldorado National Co.*, 2004 U.S. Dist. LEXIS 21205 (D.Kan. 2004) (based on testimony plaintiff's position classified improperly and she was performing managerial duties and evidence showing all supervisors were male, summary judgment denied on EPA claim).

The decision below also concluded, "Plaintiff was paid less than supervisory employees and she was not eligible for and did not receive stock through the Management Incentive Program ["MIP"]" App. 1791. The court nonetheless concluded as a matter of law, "[n]one of this evidence would allow a reasonable juror to conclude that Defendant's stated reasons for classifying plaintiff's job as a [non-MIP] dispatch specialist, rather than a supervisor, are pretext for discrimination….the evidence is undisputed that the dispatch specialist and supervisor positions were dissimilar in terms of responsibilities." App. 1810-11. Accordingly, the district court improperly granted summary judgment on plaintiff's Title VII classification and pay claims.

**V.    The District Court's Evaluation of Plaintiff's Title VII Classification and Discriminatory Pay Claim Was Clearly Erroneous; Title VII Reaches All Claims of Intentional Pay Discrimination – Regardless of Whether There is an Opposite-Sex Comparator Who Earns More.**

The district court's analysis of Ms. Daniels' Title VII classification and pay claims improperly applied a higher standard of proof, ignored evidence favorable to Ms. Daniels, and resolved disputed issues of material fact in Defendant's favor.

The district court erroneously concluded Ms. Daniels was required to show she was performing the same work as a higher paid male. App. 1809 ("while she did perform

32

some of the same responsibilities, there were significant responsibilities she did not perform"). Yet, Title VII reaches all claims of intentional pay discrimination, regardless of whether there is an opposite sex comparator who earns more. Under both the EPA and Title VII, she was not required to prove she was paid less than every comparable male employee. *See Merrill v. Cintas Corp.*, 941 F.Supp. 1040, 1044 n. 4 (D.Kan.1996). It is enough for the plaintiff to show that there is discrimination in pay with respect to one employee of the opposite sex. *See EEOC v. White & Son Enter.*, 881 F.2d 1006, 1009 (11th Cir.1989).

In contrast to the Equal Pay Act, "Title VII incorporates a more relaxed standard of similarity between male and female-occupied jobs," and a "plaintiff is not required to meet the exacting standard of substantial equality of positions set forth in the Equal Pay Act." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1529 n. 11 (11th Cir.1992). *See also Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1362 (10th Cir.1997); *County of Washington v. Gunther*, 452 U.S. 161, at 178-79, 181 (1981). In *Gunther*, the Supreme Court specifically rejected the notion that "only those sex-based wage discrimination claims that satisfy the `equal work' standard of the Equal Pay Act could be brought under Title VII." 452 U.S. at 178.

The district court failed to recognize that compensation discrimination in violation of Title VII or the ADEA can exist in a number of forms. For example, as recognized by the EEOC and has taken place here, discrimination occurs when:

> The compensation of one or more employees in a protected class is artificially depressed because of a discriminatory employer practice that affects compensation, such as steering employees in a protected class to

33

lower paid jobs than persons outside the class, or discriminating in promotions, performance appraisals, procedures for assigning work, or training opportunities.

*EEOC Compliance Manual*, Sect. 10, Compensation Discrim.

To be actionable under Title VII, the work performed by the female employee need only be similar, or comparable, to that of a higher paid male employee. *See Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355, 1362-63 (10th Cir. 1997); *Meeks v. Computer Assoc. Int'l*, 15 F.3d 1013, 1019 (11th Cir.1994).

The district court erred in concluding Ms. Daniels could not establish that her lower pay occurred under circumstances which give rise to an inference of discrimination. App. 1809-10. *See Hysten v. Burlington N. & Santa Fe R.R. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002)("[C]ourts must be sensitive to the myriad of ways such an inference can be created.")(*citing Equal Employment Opportunity Comm'n v. Metal Serv. Co.*, 892 F.2d 341, 348 (3d Cir.1990)). Under Title VII, plaintiff can satisfy this element of a prima facie case of wage discrimination by showing that she occupied a job *similar* to that of higher paid employees. *Mehus v. Emporia State Univ.*, 222 F.R.D. 455, 481 (D. Kan. 2004).

The evidence establishes Ms. Daniels performed the work of a supervisor but was paid less only because UPS intentionally did not classify her job as "full-time supervisor." Based on a consideration of all the surrounding evidence, a jury could logically infer that that UPS's choice not to correctly classify her job was motivated in part by her sex. Under the district court's erroneous analysis, a woman like Ms. Daniels holding a job that is unique or simply not the exact equivalent of any job performed by a

higher-earning man can never prevail on a Title VII discriminatory classification or pay claim.    Accordingly, the district court should have denied defendant's motion for summary judgment on this claim.

**VI.    UPS Did Not Comply with Its Promotion Policies and Deliberately Failed to Process and Respond to Plaintiff's Promotion Applications Giving Rise to The Reasonable Inference That UPS's Treatment of Plaintiff Was Because of Her Sex and/or Age.**

The district court erred in its evaluation of plaintiff's promotion claims by failing to  credit and analyze UPS's admission that it violated its promotion policies and procedures.   App. 94, 800, 803, 1057, 1077, 2213, 2261, 2264 .   Plaintiff held and performed the duties of the cover dispatch position from 2004 to 2008.   App. 779, 783, 909.  Her former manager, Mic Haynes, testified Ms. Daniels was performing full-time supervisor work, was fully qualified for promotion to full-time supervisor as early as 2005, and was the individual best qualified to hold the cover position.   App. 780-82, 791, 795-99, 823, 884, 887-88.   The district court refused to credit this evidence that Ms. Daniels was already fully qualified in 2005 for promotion to full-time supervisor, and failed to allow the jury to reach the reasonable inference that it was impossible for Mr. Isabell to be better qualified to perform Ms. Daniels' job in 2008, unless there was discrimination afoot.   The district court erred in ruling on this issue based on the irrelevant conclusion that Mr. Haynes, "does not have any personal knowledge about plaintiff's job responsibilities after 2005." App. 1812.  But Ms. Daniels remained in the same cover position after 2005, so Mr. Haynes's knowledge of that job is relevant. UPS's subjective assessments of Ms. Daniel's performance and qualifications cannot be

used to defeat her prima facie case. *See, e.g., EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1192 (10th Cir.2000); *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1470 (10th Cir.1992). This is particularly so where, as here, the employee has held her position for a significant period of time. *Id.*

The opinion of the lower court also neglected to address Plaintiff's assertion of the futile gesture doctrine with respect to her later not applying for a promotion. App. 754, 802-05, 807. It has long been recognized that "a nonapplicant can be a victim of unlawful discrimination entitled to make-whole relief when an application would have been a useless act serving only to confirm a discriminatee's knowledge that the job he wanted was unavailable to him." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 367 (1977). *See, e.g., also Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576 (1978)(accord; holding failure to submit application is not fatal to failure to hire claim); *E.E.O.C. v. Metal Service Co.*, 892 F.2d 341, 348 (3rd Cir.1990)(collecting cases, reaffirming that the failure to formally apply for a job will not bar a Title VII plaintiff from establishing his claim where the plaintiff conveyed his interest in the job to the employer).

The district court failed to acknowledge UPS's repeated admissions it did not follow its promotion policies, while concluding Ms. Daniels could not assert a systematic failure to promote claim because she did not follow UPS's promotion policy when she did not submit additional letters of interest in promotion after UPS scuttled her earlier applications. App. 1797-98. Thus, the court found that only Ms. Daniels, but not UPS, was required to comply with UPS promotion policies. *Id.* In sum, Plaintiff presented

ample prima facie and pretext evidence in support of her failure to promote claims addressing conduct involving quintessential pay-related decisions under circumstances which would reasonably allow a jury to find UPS's conduct was based on plaintiff's sex and/or age and its asserted reasons for its conduct are false or unworthy of belief. Accordingly, the grant of summary judgment should be reversed on this claim.

## A. The District Court Misinterpreted and Misapplied the Ledbetter Fair Pay Act and *Morgan* With Respect to Plaintiff's Timely Pay and Promotion Claims.

The district court's analysis and conclusions regarding the timeliness of plaintiff's promotion and pay claims with respect to the application of the Ledbetter Fair Pay Act (the "FPA") are clearly erroneous. In Kansas, an aggrieved individual can bring a charge up to 300 days after receiving compensation that is affected by a discriminatory compensation decision or other discriminatory practice, regardless of when the discrimination began.[6] If a charge alleges compensation discrimination under Title VII, the ADA, the Rehabilitation Act, or the ADEA, the filing period begins when any of the following occurs: 1) the employer adopts a discriminatory compensation decision or other discriminatory practice affecting compensation; 2) the charging party becomes subject to a discriminatory compensation decision or other discriminatory practice affecting compensation; or 3) the charging party's compensation is affected by application of a discriminatory compensation decision or other discriminatory practice,

---

[6] Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5 (2009). Signed into law on January 29, 2009, the Lilly Ledbetter Fair Pay Act has a retroactive effective date of May 28, 2007, and applies to claims of compensation discrimination pending on or after the effective date.

including each time wages, benefits, or other compensation is paid, resulting in whole or part from such discriminatory decision or practice. *Id.*

The district court erroneously held Ms. Daniels' promotion claim – indisputably concerning a supervisory position with greater pay and other economic benefits – was not covered by the FPA because the source of the disparity in pay was UPS's failure to promote her and refusal to correctly reclassify her, and these, the court below found, are not "pay-setting" decisions; thus, the court declined to give effect to the plain language statutory coverage of "compensation decision or other practice affecting compensation" under the FPA. App. 1802. In addition to the plain language of the statute, which the district court erred in refusing to apply, numerous well-reasoned decisions have held failure to promote and other claims affecting pay are compensation decisions covered by the FPA.[7]

The district court's conclusion that the FPA was intended to address and covers only decisions denominated pay setting by the employer is belied by the actual facts in Ledbetter. In *Ledbetter*, the plaintiff alleged:

---

[7] *See, e.g., Mikula v. Allegheny County of Pa.*, 583 F. 3d 181(3rd Cir. 2009) (summary judgment reversed in light of FPA; finding failure to answer a request for a raise qualifies as a compensation decision because the result is the same as if the request had been explicitly denied); *Bush v. Orange County Corrections Department*, 597 F. Supp. 2d 1293, 1295, 1296 (MD Fla., Orlando Div. 2009) (plaintiffs could timely challenge demotions accompanied by reductions in pay, that occurred 16 years before their EEOC charges); *Gentry v. Jackson State University*, 2009 WL 1097818 (S.D. Miss. 2009) (FPA applies to promotions affecting compensation); *Rehman v. State University of New York at Stony Brook*, 596 F.Supp.2d 643, 651 (E.D. NY 2009) (same); *Gilmore v. Macy's Retail Holdings*, 2009 WL 305045 (D.N.J. 2009) (Ledbetter Act applied to discriminatory promotion decision affecting higher paying job).

"during the course of her employment several supervisors had given her poor evaluations because of her sex, that as a result of these evaluations her pay was not increased as much as it would have been if she had been evaluated fairly, and that these past pay decisions continued to affect the amount of her pay throughout her employment."

*Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 127 S. Ct. 2162, 2165-66 (2007).

The FPA was enacted so that a timely charge may be asserted with each future paycheck brought about by a past discriminatory compensation decision or related practice.  The FPA merely codified the earlier rule that a plaintiff need not file a charge within 300 days of the initial conduct that results in the discriminatory pay.  Prior to the *Ledbetter* decision, a majority of circuits, including the Tenth, followed the "pay check accrual rule."[8]  The district court also states the FPA did not overturn *Morgan*; however, the FPA expressly overturned the *Ledbetter* decision, which derived its analysis from *Morgan*.  Clearly, then, the correct application of *Morgan* has been altered by the FPA.

The district court also made the incongruous finding that "[o]f course, many employment decisions have some later effect on pay, even if they are not pay setting decisions."  App. 1802.  Likewise, the court finds "this is not a pay-setting decision, but instead, a discrete discriminatory act that *merely* could have had an ultimate effect on pay."  App. 1803. (emphasis added). The district court's assertion that an employment

---

[8] *See, e.g., Forsyth v. Federation Employment and Guidance Serv.*, 409 F. 3d 565, 573 (2nd Cir. 2005); *Shea v. Rice*, 409 F. 3d 448, 452-453 (D.C. Cir. 2005); *Hildebrandt v. Illinois Dept. of Natural Resources*, 347 F. 3d 1014, 1025-1029 (7th Cir. 2003); *Goodwin v. General Motors Corp.*, 275 F. 3d 1005, 1009-1010 (10th Cir. 2002); *Cardenas v. Massey*, 269 F. 3d 251, 257 (3rd Cir. 2001); *Ashley v. Boyle's Famous Corned Beef Co.*, 66 F. 3d 164, 167-168 (8th Cir. 1995) (en banc); *Brinkley-Obu v. Hughes Training, Inc.*, 36 F. 3d 336, 347-349 (4th Cir. 1994); *Gibbs v. Pierce County Law Enforcement Support Agency*, 785 F. 2d 1396, 1399-1400 (9th Cir. 1986).

decision which "merely" has an adverse impact on pay is not a "pay-setting" decision presents a non-sequitur.  It simply defies logic to conclude that a failure to promote under the facts of this case is not a compensation decision or other practice. In the absence of a statutory definition contradicting the plain meaning of the words, a decision that directly changes or maintains compensation  is a "compensation decision or other practice."  Ms. Daniels was subject to hidden pay related decisions that harmed her each time she received a discriminatory paycheck. Pursuant to the FPA, plaintiff's failure to promote claims were timely.  The district court's decision was clearly erroneous and should be reversed.

**B. The District Court Failed to Apply the Futile Gesture Doctrine to Ms. Daniels' Failure to Promote Claim.**

Ms. Daniels presented uncontroverted evidence demonstrating the reasonableness of her conclusion that submitting further promotion applications would be a futile gesture.  App. 800, 803, 842-47, 873, 875, 882, 885-86, 888, 1076.  UPS admittedly did not process plaintiff's promotion applications and, further, the company admittedly was not complying with its promotion policies.   App. 98, 902-03, 923-24, 2172-73.  The court's refusal to consider plaintiff's proper assertion of the futile gesture doctrine was clearly erroneous and contrary to Judge Robinson's analysis and application of the futile gesture doctrine, and denial of summary judgment in *Klindt v. Honeywell Intern. Inc.*, 303 F. Supp. 2d 1206, 1215-16. (D.Kan. 2004) .

The court failed to support its conclusion that plaintiff should have followed UPS promotion policy and submitted new applications every year, when the company

admittedly was not following its promotion policies and would not process plaintiff's applications. The court disregarded the evidence that it was not until Ms. Daniels meeting with Gary Liberty in July 2008 that she was told for the first time by UPS management that the company had not been following its promotion policies and procedures and properly processing promotion applications. App. 842-44. Plaintiff's promotion claims were timely and summary judgment was improperly granted as to such.

## VII. The District Court Erred in Concluding Plaintiff Could Not Establish Retaliation as a Matter Of Law.

The lower court erred in applying the abrogated "adverse employment action" legal standard to Ms. Daniels' retaliation claims; the reasonable effect of the totality of UPS's conduct towards Ms. Daniels could be found by a reasonable jury to satisfy the proper legal standard of a "materially adverse" action. UPS's actions and course of conduct in ignoring her discrimination complaint, intentionally and continuously isolating her from regular business communications, and finally threatening her job and her 20-plus-year career with accusations of fraud UPS knew to be false, might reasonably dissuade a person in Ms. Daniels' position from pursuing a discrimination complaint. The district court's decision should be reversed.

### A. The District Court Erroneously Applied the Abrogated Legal Standard to Ms. Daniels' Title VII Retaliation Claim.

The anti-retaliation provision of Title VII, Section 704(a) is not denominated as such, but instead refers to "Other Unlawful Employment Practices." 42 U.S.C. § 2000e-3(a). The conduct prohibited by this statutory provision is broad and unqualified: employers may not "discriminate" against those who assert their civil rights. The

41

reference to "discrimination" is unconnected to "terms and conditions of employment" as in the anti-discrimination provision, Section703(a), as the Supreme Court held in *Burlington Northern and Santa Fe Ry. Co. v. White*, 547 U.S. 53, 61 (2006). The Court in *Burlington* distinguished the discrimination standard, which requires proof of an "adverse employment action" to the lower retaliation standard of showing a "materially adverse action," which occurs when an employer takes an action of any kind that "might well dissuade" a reasonable employee from exercising his legal rights. *Id*. at 68. The chilling deterrent effect of each act is magnified by the next, and must be considered together. "[T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Burlington*, 126 S.Ct. at 2415.

Placing a complaining employee under duress, for example, by withholding business information (including safety information), or by making her fear that the boss has fabricated a charge of gross misconduct to fire her, or by sending the message that discrimination complaints are forbidden and futile by ignoring them in contravention of written company policy, is precisely the kind of conduct the anti-retaliation provision is intended to prevent. *Burlington* at 67.

The relevant inquiry is whether the employer's intentional conduct is likely to be effective in preventing the exercise of protected civil rights through *some form of coercion*, and not on whether such actions have any directly observable effect in the workplace. Employer actions prohibited by the anti-retaliation provision are not limited

to conduct that "affects the employee's 'compensation, terms, conditions, or privileges of employment." *Id*. at 61.[9]

Contrary to *Burlington*, the district court in the case at bar fundamentally erred in applying the abrogated, more narrow, and more demanding "adverse employment action" standard, to reject all of Ms. Daniels' retaliation claims. App. 1819. The district court concluded that UPS's conduct in falsely accusing Ms. Daniels of a terminable time-card offense (i.e., threatening to fire her), "immediately after a discussion about plaintiff's previous complaints of discrimination" and "immediately after discussing plaintiff's EEOC questionnaire with her," did not constitute conduct that might dissuade a reasonable worker from pursuing her rights. App. 1820-21. The lower court erroneously resolved a disputed issue of material fact by concluding, as a matter of law, that UPS knowingly, falsely accusing Ms. Daniels of fraud and threatening her with termination for the first time in her decades long tenure, "did not adversely impact her employment," and, more specifically, "did not affect her salary, benefits, or working conditions and had no impact on her employment status." App. 1818. This analysis tracks the higher legal standard for proof of an adverse employment action, and was erroneously applied to Ms. Daniels' proof of retaliation.

Whether a particular adverse action satisfies the materiality threshold is generally a jury question; the judge's role is limited to determining whether, viewing the evidence

---

[9] *See Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 n.2 (10th Cir. 2006)(adopting *Burlington* "materially adverse action" standard for Title VII retaliation claims). *See also Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219, 1226 (10th Cir.2006)(new standard applied to ADEA and ADA retaliation claims).

in the light most favorable to the plaintiff, a reasonable jury could find the action materially adverse. *Rattigan v. Holder*, 643 F.3d 975, 986 (D.C. Cir. 2011) *(citing Pardo–Kronemann v. Donovan,* 601 F.3d 599, 607 (D.C.Cir.2010). The district court viewed the evidence in the light most favorable to UPS by describing such career-ending threats as mere "verbal warnings" App. 1818.  Regardless of whether the threat is carried out, being threatened with termination – particularly, falsely and in combination with other acts – is a materially adverse action. *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1090 (10th Cir. 2007)(whether action is materially adverse is for jury; tangible psychological or monetary injury not required). The district court's use of the wrong test, as well as its failure to evaluate the evidence properly, requires that summary judgment on plaintiff's retaliation claims be reversed.

**B.  UPS Management's Materially Adverse Professional Isolation of Ms. Daniels.**

Ms. Daniels complained of discrimination to UPS HR manager Gary Liberti in July 2008.  App. 816-17, 819-24, 963-64, 966, 968-69 .  UPS failed both to follow its policy to investigate her complaint and to honor its pledge to do so and report back to her, App. 823, 847, 1025, 1789, 2191; and, so, in August she completed an EEOC Intake Questionnaire, and perfected her EEOC Charge in November 2008.  App. 962, 966. Immediately following the filing of Ms. Daniels' EEOC Charge, her manager Mr. Dooley abruptly and, as the court found, "significantly" reduced his business communications with her, thereby intentionally depriving her of business information and instructions she formerly received, and which others who had not engaged in protected activity continued to receive.  App. 827, 830, 1789.

44

The lower court also erred in concluding that this significant change in Ms. Daniels' access to business information was not a materially adverse action.  App. 1819. The decision below concluded, contrary to the record testimony, that this abrupt change had no effect on Ms. Daniels' work.  App. 1819.  As a matter of fact, Ms. Daniels testified that this retaliatory isolation was accomplished by a dramatic decrease in daily e-mails and voice mails from Mr. Dooley, which, obviously, interfered with and impeded her ability to do her job.  App. 827, 830.  Thus, the lower court erred in failing to credit Ms. Daniels' evidence, and the decision should be reversed on this basis alone.

This was not an isolated occurrence, but as the evidence showed, a continuing course of harassing conduct.  App. 827, 830.  The court mischaracterized this retaliation in the singular, as "a" snub.  App. 1819.  Under the retaliation provision of Title VII, a "plaintiff need not establish harassment that is severe or pervasive but need only show conduct that, taken together, might dissuade a reasonable person from pursuing a charge." *Haney v. Preston*, No. 08-2658, 2010 WL 5392670 (D. Kan. Dec. 22, 2010).

The court found as a matter of fact that after Ms. Daniels filed her EEOC Charge, "she noticed a *significant* decrease in *business* communication from [her manager] Dooley," App. 1789 (emphasis added), and erred as a matter of law when it concluded, 'this is merely a snub by her supervisor that admittedly did not affect her job performance," and opined that the significant decrease in business communication by her supervisor, "constitutes a petty slight or minor annoyance." App. 1819.  It was plain error for the court below to dismiss this claim by the expedient of branding this adverse action a "snub" without any evidentiary foundation. UPS's pattern of intentional withholding of

45

business information from a subordinate methodically over a course of months is not a simple, isolated "snub."  In holding this alleged "snub" could not be found materially adverse, the lower court relied on the distinguishable reasoning in *Steele v. Kroenke Sports Enters., LLC*, 264 F. App'x 735, 746 (10th Cir. 2010), a case which concluded a single verbal warning did not constitute a materially adverse action.  By contrast, here the lower court itself concluded Ms. Daniels' immediate manager "significantly" decreased business communications. The district court concluded that since Ms. Daniels was only denied most, but not all such business communications, this was an immaterial snub. App. 1819.  A jury could readily find otherwise.

These daily "snubs" were not personal but business related, and they were visited upon Ms. Daniels, and only to Ms. Daniels, every day, and only every day after she complained of discrimination.    This  substantial  decrease  in  daily  business communications also cannot be reconciled with UPS's professed concerns regarding fear of service failures.  The opinion below fails to point to any undisputed evidence where UPS even meets its burden of <u>production</u> to explain why Ms. Daniels was suddenly snubbed by her manager daily thereafter.  There is none.  The district court simply excused this unrebutted, unexplained pattern of retaliatory isolation and abuse *sua sponte*, and without explanation or further comment beyond labeling it so. Furthermore, as a matter of law, even under the higher standard for establishing discrimination under Title VII, a plaintiff "need not prove that his or her tangible productivity has declined as a result of the harassment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993)(J. Ginsburg, concurring, citing *David v. Monsanto Chemical Co.,* 858 F.2d 345, 349 (6th

46

Cir. 1988)).    The fact that Ms. Daniels was able to continue to perform the less demanding duties of the night shift through means other than learning of necessary business information from her manager makes the attempt to segregate, isolate, and coerce her because of her protected activity no less unlawful.

### C. Like this Court, a Reasonable Jury Could Conclude UPS's Threatening Ms. Daniels' Job in the Same Meeting Where Its Managers Exhibited Physical Hostility Towards her Because of Her EEOC Charge was Materially Adverse.

This Court has held that threats may reveal illegal retaliatory intent, and that it is reasonable to conclude that a worker exposed to such actions could be discouraged from pursuing a charge:

> We do not doubt that a reasonable employee could well find such a combination of threats and actions taken with the design of imposing both economic and psychological harm sufficient to dissuade him or her from making or supporting a charge of discrimination.  Indeed, we have found lesser conduct to suffice under similar legal standards.

*Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1090-91 (10th Cir. 2007)(citing cases).    The district court erred in holding a job threat accompanied by physical remonstration which follow a reference to protected activity cannot be materially adverse.

Ms. Daniels filed a charge with the EEOC on November 21, 2008 which UPS would have received notice of, at the earliest, in early December.  App. 966.  Shortly after the end of the frenzied, "all hands on deck" holiday "peak" period at UPS, *see Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1028 (8th Cir. 2008), Ms. Daniels

was ordered to attend a meeting with her manager in January 2009 and, then, HR in February.[10]  App. 813-14, 831-34, 849-51, 968-69, 1113.

At that second meeting, immediately after telling her that her EEOC Charge was received, HR manager Liberti falsely accused Ms. Daniels of terminable timekeeping fraud – the first such accusation of wrongdoing in her career.  App. 813-14, 817-18, 831-32, 968-69.  The court further summarily disregarded the evidence that during the course of this meeting Mr. Liberti was angrily slapping plaintiff's EEOC charge and threateningly "asking" Ms. Daniels "do you want me to get the EEOC down here!?" App. 831-32, 968-69.  This is readily distinguishable from *Turrentine v. United Parcel Service, Inc.*, 645 F. Supp. 2d 976, 991 (D.Kan. 2009), where the district court held no materially adverse action occurred when the same HR manager, Mr. Liberti, called a meeting at which he browbeat the plaintiff about filing a charge and called his lawyer stupid.  In *Turrentine*, the tirade was not directly connected to the leveling of false accusations of terminable fraud.  *Id*.  Yet, in this case, the close nexus between the "discussion" of Ms. Daniels' EEOC charge and falsely accusing her of conduct which could result in termination is a dispositive factual difference.  UPS's treatment of Ms. Daniels could well dissuade a reasonable person from making or pursuing a charge of discrimination.

---

[10]  The district court failed to recognize evidence of causation in part because it erroneously referenced only the date of Ms. Daniels internal complaint of July 31, 2008 that was ignored by UPS, rather than her November 2008 EEOC charge.  App. 1818.  Obviously, the later November 2008 protected act of filing with an outside federal government agency is an independent and more potent trigger for retribution.

48

### D. The District Court Failed to Consider the Evidence of Duplicity in UPS's Proffered Explanation for Threatening Ms. Daniels with Termination.

UPS's threats were retaliatory and its explanation for threatening Ms. Daniels' career was pretextual.  The evidence showed the supposed timekeeping policy was not generally applied and was not even consistently applied by UPS to Ms. Daniels. *See McInerney v. United Air Lines, Inc.*, 2011 WL 1350453 (10th Cir. Apr. 11, 2011)(concluding evidence of absence of uniform enforcement of purported leave policy would support jury finding of pretext).  The corporate ruse employed by UPS here, of creating an illusory record of seeking compliance with wage and hour laws, while imposing de facto policies of noncompliance on workers was recently addressed in *Kuebel v. Black & Decker*, 643 F.3d 352, 363-64 (2d Cir. 2011).

UPS's false accusation against Ms. Daniels, and its claim that it investigated others, cannot be reconciled with its longstanding practice of forcing Ms. Daniels and other employees to work through their breaks.  App. 818, 852, 895, 1110-11. The evidence that UPS management gave Ms. Daniels conflicting orders regarding taking and recording breaks was similarly disregarded.  App. 1110-11 .  UPS management knew that it forced its employees to work through breaks, knew the time recordation it demanded was illegal, and took no action to end the practice; yet, then, suspiciously right after Ms. Daniel's November EEOC charge, UPS seized upon this to disingenuously accuse Ms. Daniels of related misconduct.  App. 813-14, 817-18, 833-34, 852, 895, 849-51, 2265-67.

Accusing an employee of engaging in conduct involving dishonesty and fraud will cause the employee to believe that her job is in jeopardy regardless of the falsity of the

49

charges.  A reasonable jury could conclude as much even when the warning and meeting did not directly or immediately result in any loss of wages or benefits and no written reprimand was given.  *See, e.g., Millea v. Metro-North R.R. Co.*, No. 10-409, 2011 WL 3437513 (2d Cir. Aug. 8, 2011)(holding accusing an employee of improper conduct that could result in termination is a materially adverse action under the FMLA).  A reasonable jury could find a "warning" of this kind materially adverse; the district court erred in deciding the issue as a matter of law.

### E.  Retaliatory Failure to Address Ms. Daniels' Discrimination Complaint.

After Ms. Daniels' July 2008 complaint of the discrimination, Mr. Liberti told her he would follow up with her bosses and then follow up with her.  App. 823, 847.  As the court correctly found, "No one ever followed up with Plaintiff about her July 31, 2008 meeting." App. 1789.  Yet, the court concluded that even if UPS did not investigate her discrimination complaints as discrimination complaints, Liberti at least, "discussed her underlying complaints with Dooley and Christie." App. 1820.  However, Mr. Dooley denied Mr. Liberti ever discussed the matter with him at all. App. 828, 849-51.  Further, UPS violated its own written policy by failing to take any action to address Ms. Daniels' discrimination complaint and follow-up with her.  App. 1025, 2191.  The court below made no mention of this evidence.

An employer's failure to investigate an internal complaint of discrimination may constitute retaliation.  *See, e.g., McInerney v. United Air Lines, Inc.*, 09-1423, 2011 WL 1350453 (10th Cir. Apr. 11, 2011) (failure to investigate complaint indicates retaliatory motive); 2 EEOC Compliance Manual, Section 8, Retaliation, Chapter II, Part D, § 1

(May 20, 1998) ("[s]uspending or limiting access to an internal grievance procedure [ ] constitutes an 'adverse action."). *See, e.g., also EEOC v. Board of Governors of State Colleges & Universities*, 957 F.2d 424 (7th Cir. 1992) (termination of a grievance process constituted an adverse employment action in violation of the anti-retaliation clause of the ADEA); *Johnson v. Palma*, 931 F.2d 203 (2d Cir. 1991) (union's refusal to proceed with plaintiff's grievance after he filed race discrimination complaint with state agency constituted unlawful retaliation).   Further, a complainant can use the employer's failure to investigate – or failure to investigate adequately – as proof of pretext.  *See Duchon v. Cajon Co.*, 791 F. 2d 43 (6th Cir. 1986) ("little or no attempt was made to investigate or hear Duchon's side of the story…sufficient to defeat a motion for summary judgment.").

The district court improperly removed this issue from a jury. A reasonable employee could well be dissuaded from bringing or pursuing a charge of discrimination if the employer, contrary to law and its own policies, fails to investigate or otherwise respond to a complaint of discrimination. The district court's decision should be reversed.

## <u>CONCLUSION</u>

For all the foregoing reasons, the district court's Order granting summary judgment to defendant on plaintiff's Title VII and ADEA sex and age discrimination and retaliation claims should be reversed and this case remanded to the district court for a jury trial as to those issues.

## ORAL ARGUMENT REQUESTED

Appellant respectfully requests oral argument for the following reasons:

(1) because the issue of the application and scope of the Ledbetter Fair Pay Act and the Supreme Court *Morgan* decision is of exceptional importance; (2) because the issue of determining the timeliness of a charge filed in connection with an independent discriminatory act that is part of a pattern or practice is of exceptional importance; (3) because the issue of whether an employee's unannounced removal from a long held position and permanent placement in a full-time position with significantly diminished responsibilities and opportunities and a much less favorable schedule is an adverse employment action is of exceptional importance; and, (4) because the issue of whether an employee who has filed an EEOC charge being falsely accused of misconduct for which they could be fired, experiencing a significant decrease in important business communications from their manager, and the employer's refusing or failing to investigate the employee's complaint of discrimination, contrary to law and the employer's policy, is a materially adverse employment action pursuant to the Supreme Court *Burlington* standard is of exceptional importance.

Respectfully submitted,

LAW OFFICES OF FREDRICK D. DEAY, II

By: s/ Fredrick D. Deay, II
Fredrick D. Deay, II    KS Bar No. 15035
7575 W. 106th Street, No. 14
Overland Park, KS 66212
(913) 649-0687
fddpai2@hotmail.com

POPHAM LAW FIRM
Dennis E. Egan    KS Bar No. 70672
712 Broadway, Suite 100
Kansas City, MO 64105
(816) 399-5202
(816) 221-3999 - Fax
degan@pophamlaw.com

Attorneys for Appellant - Regina Daniels

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this Opening Brief is proportionally spaced and contains 13,790 words.  The word processing software utilized in preparing the brief (Microsoft Word 2010 Office) was relied upon to obtain the word count.  The undersigned  also certifies that the information on this form is true and correct to the best of his knowledge and belief formed after a reasonable inquiry.

s/Fredrick D. Deay, II
Fredrick D. Deay, II

Attorney for Appellant


## CERTIFICATE OF DIGITAL SUBMISSIONS

The undersigned hereby certifies that all required privacy redactions have been made, and that with the exception of any such redactions, every document submitted in Digital Form or scanned PDF format is an exact copy of the written document filed with the Clerk; and the digital submissions have been scanned for viruses and are believed to be virus-free.

/s Fredrick D. Deay, II
Fredrick D. Deay, II

Attorney for Appellant

## **CERTIFICATE OF SERVICE**

      I hereby certify that on September 23, 2011, a copy of the foregoing brief was sent via ECF electronic service to the following:

ARMSTRONG TEASDALE LLP

Thomas B. Weaver
Jennifer Arendes
Narcisa P. Symank
7700 Forsyth Blvd., Suite 1800
St. Louis, MO  63105
tweaver@armstrongteasdale.com
jarendes@armstrongteasdale.com
nsymank@armstrongteasdale.com

Laurence R. Tucker KS#70074
2345 Grand Boulevard, Suite 2000
Kansas City, Missouri 64108-2617
lrtucker@armstrongteasdale.com

Attorneys for Defendant-Appellee

s/ Fredrick D. Deay, II
Attorney for Appellant

**<u>ADDENDUM</u>**

ams

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **REGINA DANIELS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **vs.** | ) | **Case No. 09-2304-JAR** |
| | ) | |
| **UNITED PARCEL SERVICE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Plaintiff filed this action alleging claims of discrimination and retaliation on the basis of sex and age under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act ("ADEA"), the Kansas Act Against Discrimination ("KAAD"), and the Kansas Age Discrimination in Employment Act ("KADEA"). Plaintiff also alleges a violation of the Equal Pay Act and common law claims for breach of contract, or in the alternative, promissory estoppel, under Kansas law. This matter is before the Court on defendant United Parcel Service, Inc.'s ("UPS") Motion for Summary Judgment (Doc. 90). The Court also considers UPS' motions to strike the following evidence submitted by plaintiff in response to summary judgment: the deposition testimony of Mark Samborski (Doc. 112), the deposition testimony of William J. Sifuentes (Doc. 113), the declaration of Kathleen Carpenter (Doc. 123) and the deposition testimony of Catherine Bleish (Doc. 124). The motions are fully briefed and the Court is prepared to rule. As described more fully below, defendant's motion for summary judgment is granted. Defendant's motions to strike are granted in part and denied in part.

## I.   Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[1] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[3] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4] An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6] In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[7]

---

[1]Fed. R. Civ. P. 56(a).

[2]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler,* 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[11]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[12]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[13]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[14]  When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[15]

---

[8]*Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[9]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

[10]*Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197-98 (10th Cir.2000) (quoting *Adler,* 144 F.3d at 671); *see Kannady,* 590 F.3d at 1169.

[11]*Adams*, 233 F.3d at 1246.

[12]Fed. R. Civ. P. 56(c)(4).

[13]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[14]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[15]*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[16]  The Court takes this opportunity to comment that this general rule does not appear to hold much weight in this case.  Despite estimating that trial would take five to seven days, the briefing in this case ballooned in size as it progressed, culminating in over 200 pages for the reply memorandum and related motions to strike.  Most of the voluminous briefing involves the lengthy responses to factual statements presented by the parties.  Defendant presented 107 statements of fact; plaintiff presented 108.  While the factual statements themselves are generally reasonable in number and length, the statements in opposition by both parties are not.  Upon review, the Court finds that both parties are guilty of using the "point-counterpoint" method to argue their cases, rather than to concisely discuss and directly controvert the record evidence.[17]  The statements made in opposition to statements of fact are unwieldy, argumentative, and often not relevant.  And a fair amount of the additional facts presented by plaintiff overlap with the factual averments presented by defendant—at times, they appear to differ in semantics alone.

To be sure, presenting this volume of lengthy, immaterial, repetitive, argumentative and duplicative facts for the Court to unravel does not allow for a "speedy and inexpensive" determination of this action.  To the contrary, it creates a laborious task for the Court that is anything but speedy and surely is not inexpensive for the parties.  Nonetheless, the Court has endeavored to sort through the parties' unnecessarily difficult presentation of the facts and disregards those statements that either do not comport with the record evidence, are

---

[16]*Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[17]Of course, the Court's local rule only imposes a page limit for the argument section of the brief.  While both parties requested and were granted leave to file their briefs in excess of these page limits, the Court was not forewarned that the factual matter in those briefs would be so unwieldy.

argumentative, are immaterial, or that require the Court to weigh evidence and make credibility

determinations.

## II.    Motions to Strike and Evidentiary Objections

### A.    *Separately-filed Motions to Strike*

Defendant moves to strike four exhibits attached to plaintiff's response, which all entail

testimony by other UPS employees that they have suffered or witnessed discriminatory treatment

by UPS.  The amendments to Fed. R. Civ. P. 56(c), effective December 1, 2010, provide the

appropriate summary judgment procedures for setting forth the parties' factual positions.  This

includes the provision that "a party may object that material cited to support or dispute a fact

cannot be presented in a form that would be admissible in evidence."[18]  The advisory committee

notes on this amendment explain:

> The objection functions much as an objection at trial, adjusted for
> the pretrial setting.  The burden is on the proponent to show that
> the material is admissible as presented or to explain the admissible
> form that is anticipated.  There is no need to make a separate
> motion to strike.  If the case goes to trial, failure to challenge
> admissibility at the summary-judgment state does not forfeit the
> right to challenge admissibility at trial.[19]

Yet, defendant filed four separate motions to strike along with its reply memorandum, resulting

in over 100 pages of additional briefing on the admissibility of these four exhibits.[20]  The Court

---

[18]Fed. R. Civ. P. 56(c)(2).  Defendant's motion for summary judgment was filed on December 1, 2010.  The motions to strike were filed on March 24 and March 28, 2011.  They are subject to the amended version of Rule 56 which became effective December 1, 2010.

[19]Fed. R. Civ. P. 56 advisory committee's note.

[20]Defendant apparently believed its extra pages of briefing on the motions to strike was necessary in addition to its 193-page reply memorandum, most of which is consumed by disputing factual material presented in plaintiff's response.  And surely, some of this volume could have been eliminated by simply refraining from unnecessarily cutting and pasting each of plaintiff's additional statements of fact into the reply.  In that reply, defendant also suggests that plaintiff's evidentiary objections should not be considered in the absence of a separate motion to strike.  For the reasons set forth above, this position is inaccurate.  Evidentiary objections should be made

5

takes this opportunity to stress that such expansive briefing is unnecessary—the motions to strike

are duplicative of each other and duplicative of the arguments made in the reply itself—and

overly argumentative.  It suffices that the party objecting to summary judgment material simply

state the objection with a brief description (akin to a speaking objection) and a citation to the

Federal Rule or case upon which the objection is based, in response to the factual averment

itself.  The response to such an objection should be equally brief.  Nonetheless, the Court

proceeds to briefly discuss defendant's motions to strike before determining the uncontroverted

facts in this matter.[21]

First, defendant argues that the objected-to material does not support the facts to which

they are offered to support.  To the extent this is true, the Court reminds defendant that in order

for a fact to be deemed controverted, the Court must first find that there is evidence in the record

that supports the party's response that a fact asserted is controverted.  Likewise, it would be

contrary to this Court's obligation in deciding summary judgment to simply accept a party's

assertion that a fact is uncontroverted without verifying that the evidence supports that fact.  The

Court need not strike evidence on this basis, it simply declines to accept the parties'

characterization of a fact if the evidence does not support the factual averment.  The Court

agrees, for example, that the statement of fact that "UPS engages in a pattern of discriminatory

treatment" is not an appropriate factual averment given the cited-to evidence.  Instead, those

statements by other UPS employees only go to establish their own treatment.  The fact that other

UPS employees may have suffered discriminatory treatment may support an <u>argument</u> that UPS

_____

in response to a statement of fact without separately moving to strike.

[21]Notwithstanding the fact that the Court finds separately-filed motions to strike unnecessary and
duplicative, it declines to find that they were untimely filed.

has such a pattern of behavior, but it does not establish this as a statement of fact.  Such an argument should be made in the argument section of the brief.

Defendant further argues that certain portions of these employees' statements should be stricken for lack of personal knowledge, or because they are based on conclusory statements and conjecture.  Fed. R. Civ. P. 56(c)(4) requires that affidavits be made on personal knowledge and "set out facts that would be admissible in evidence . . . ."  Fed. R. Evid. 602 requires that a testifying witness "ha[ve] personal knowledge of the matter" testified to.[22]  "Under the personal knowledge standard, an affidavit is inadmissible if 'the witness could not have actually perceived or observed that which he testifies to.'"[23]  Statements of "mere belief in an affidavit must be disregarded."[24]

The evidence at issue on this point involves other UPS employees' treatment.  Defendant argues that none of the statements by other employees about UPS' alleged practice of discrimination are based on personal knowledge of UPS' treatment of plaintiff.  While defendant is correct that these statements are not based on personal knowledge of plaintiff's treatment, that is not what they are offered to establish.  In general, "the testimony of other employees about their treatment by the defendant is relevant to the issue of the employer's discriminatory intent."[25]  These employees have personal knowledge about their own treatment and testimony about their own treatment is admissible.  The extent to which this evidence establishes any of plaintiff's claims goes to the weight and not the admissibility of that evidence. The Court will

---

[22]Fed. R. Evid. 602.

[23]*Argo v. Blue Cross Blue Shield*, 452 F.3d 1193, 1200 (10th Cir. 2006).

[24]*Id.* (quoting *Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)).

[25]*Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1314–15 (10th Cir. 2006) (quotation omitted).

7

only consider, for purposes of determining the uncontroverted evidence, those statements that the declarant could have perceived or observed, and will construe the evidence in the light most favorable to plaintiff as the non-moving party.

Finally, defendant argues that Carpenter's declaration should be stricken because it includes conclusory allegations, speculation and conjecture. Conclusory allegations without specific supporting facts do not have probative value.[26] Also, at the summary judgment stage, "statements of mere belief" in an affidavit must be disregarded.[27] As with defendant's personal knowledge objection, Carpenter's testimony about UPS' treatment of her is admissible. Her declaration establishes that she has personal knowledge of her own experience at UPS. Yet, the declaration also includes statements about policies and practices beyond her own treatment. Carpenter repeatedly opines about UPS' treatment toward "employees" or "female employees" without providing any supporting facts as to which other employees were discriminated against, or what facts she bases these conclusory statements upon. The Court agrees that these statements are inadmissible, both because Carpenter lacks personal knowledge and because these statements are merely statements of her belief. The Court finds that Carpenter's statements of her own experiences and observations are admissible, but her statements about UPS' treatment toward other unnamed employees are not.

**B.      Evidentiary and Procedural Objections to Statements of Fact**

Plaintiff asserts a number of objections to defendant's statements of fact, such as "self-serving," "biased," or "unsubstantiated," without providing a basis for such objections. As described above, the Court considers declarations that are based on personal knowledge and does

---

[26]*Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1143 (10th Cir. 2005).

[27]*Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006).

not weigh the credibility of witnesses at this time, rendering moot plaintiff's objections based on

bias and self-serving or conclusory.  To the extent plaintiff argues that certain declarations are

unsubstantiated, the Court overrules the objections.  At the summary judgment stage, the Court

may consider any affidavit or declaration that is made on personal knowledge so long as the

declarant is competent to testify on the matters asserted.[28]  An affidavit or declaration

"substantiates" a statement of fact in the same way that plaintiff purports to support certain facts

based on the statements in her own deposition.  The fact that evidence is favorable to defendant

does render it inadmissible as biased or self-serving.  Plaintiff does not come forward with any

argument as to why these declarations should be discounted under the "sham affidavit" rule, and

the Court finds no other basis for this objection in the record.

Defendant requests in the reply memorandum that the Court strike plaintiff's statements

of additional fact that do not comply with this district's Rule 56.1, because they overwhelm and

mislead the Court with "unsupported, inadmissible, and irrelevant matters."  Again, the Court

disregards any facts that are not properly supported.  However, defendant makes it difficult for

the Court to admonish any alleged attempt by plaintiff to "overwhelm" the Court in the face of

defendant's own unnecessarily extensive and repetitive reply brief and motions to strike.[29]

Defendant argues that the Court should deem admitted all of its statements of

uncontroverted fact because plaintiff failed to comply with Fed. R. Civ. P. 56(c) by not citing to

the record with particularity in disputing those facts.  Many of plaintiff's attempts to controvert

defendant's statement of facts baldly assert that the fact is undisputed, yet "contradicted" by the

---

[28]Fed. R. Civ. P. 56(c)(4).

[29]Defendant's responses in the reply to plaintiff's statements of additional fact are anything but concise and
replete with argument.

record cited in support.  In fact, many of these objections are simply statements of additional fact

that do not dispute the statement of fact, but instead add to it.   The Court will accept as

uncontroverted any facts set forth by defendant that are not directly controverted by the record

evidence referenced by plaintiff.  The Court agrees with defendant that plaintiff often failed to

properly adhere to the method of controverting facts set forth in D. Kan. Rule 56.1, which

requires "a concise statement of material facts as to which the party contends a genuine issue

exists.  Each fact in dispute must be numbered by paragraph, refer with particularity to those

portions of the record upon which the opposing party relies."  The local rule also states that "[a]ll

responses must fairly meet the substance of the matter asserted."[30]  To the extent plaintiff

purports to controvert a fact without record support, it will not be deemed controverted.

At the same time, the Court is cognizant that part of its task in deciding summary

judgment is to determine the uncontroverted facts viewed in the light most favorable to plaintiff.

To the extent that plaintiff controverts defendant's recitation of facts as incomplete, or on the

basis of semantics, it is often in furtherance of this principle: explaining that a fact, while

generally uncontroverted, should be stated differently so as to be read in the light most favorable

to plaintiff.  The Court of course applies this principle in determining the material

uncontroverted facts in this manner, but urges both parties to more efficiently present their

factual statements in the future by meaningfully attempting to mete out the material

uncontroverted facts, as fairly supported by the record evidence, without resort to legal

argument.

III.     **Uncontroverted Facts**

---

[30]D. Kan. R. 56.1(e).

The following facts are either uncontroverted, stipulated to, or viewed in the light most favorable to plaintiff.  Plaintiff Regina Daniels was born in 1952 and is female.  She was hired by UPS as a part-time customer service representative in 1984 and became a full-time customer service representative the following year.  Plaintiff has always worked at UPS' Kansas City, Kansas ("James Street") facility.

In 1999, plaintiff applied for and became a full-time dispatch specialist in the package center.  "Dispatch Specialist" is classified by UPS as an entry level management position.  Specialists are classified below full time supervisors.  In October 1999, plaintiff laterally transferred to a dispatch specialist position in the "feeder" department.  Feeder drivers at UPS drive tractor trailer trucks with packages between UPS facilities.  As a feeder dispatch specialist, plaintiff worked dispatching tractor trailer drivers with their loads, among other tasks.  Plaintiff worked as a dispatch specialist in the feeder department until she retired in 2009; her job classification did not change from 1999 until she retired in 2009.  Plaintiff was not promoted, demoted, disciplined or discharged by UPS between 1999 and 2009.

Dispatch specialists do not have formal supervisory authority, cannot discipline or discharge employees, and are not held responsible for ensuring training, discipline and evaluations of drivers and various other employees.  Full time supervisors and specialists at UPS are sometimes required to change job functions and their hours and assignments change from time to time.  Supervisors sometimes change duties, responsibilities and departments, travel, relocate and accept lateral transfers.  Full time supervisors and managers in the feeders department supervise the feeder drivers and various other employees and are held responsible for training, discipline, evaluations and other matters.  Supervisors also fill in for each other and for the manager during absences and vacations.  Plaintiff and one other dispatcher, Kathleen

11

Carpenter, did perform supervisory duties such as giving drivers instructions and orders, being left alone in the office without a supervisor, delivering packages in their own cars, and supervising administrative assistants.

There are no full-time female supervisors or managers in the James Street feeder department.  As of July 1, 2008, thirteen out of fifty-one full-time supervisors and specialists at the James Street facility were female.  Seven out of forty full-time supervisors were female.

There are three feeder dispatch windows or shifts at the James Street facility: day (approximately 6 a.m.-2 p.m.), twilight (approximately 2 p.m.-l0 p.m.) and night (Sunday 6 p.m.-2 a.m. and Tuesday through Thursday l0 p.m.-6 a.m.).  These windows have very different duties and responsibilities and the hours are much different.  Each dispatch window at James Street is supposed to have one person assigned to work as the dispatcher on that shift and each window has different assigned duties.  At certain times, James Street has also had an employee assigned to work as a cover dispatcher in the feeder department.  This employee fills in for absences and vacations on the dispatch widows.  Feeder management considers the twilight dispatch shift at James Street to be busier and more difficult than the day and night dispatch windows because, among other things, the Hub Sort operates during the twilight shift and there is a larger volume of inbound and outbound feeder trailers and customer pickups during that shift.[31]

As a dispatch specialist, plaintiff reported to the James Street feeder manager.  The James Street feeder manager has changed several times since 2005.  Mic Haynes was the James Street

---

[31]Plaintiff's objections to the declarations of UPS feeder management are overruled and denied.  Facts that merely describe the views of feeder management are properly supported by those individuals' declarations.  Those individuals' declarations are based on personal knowledge and are not speculative.  Moreover, these facts are certainly material to defendant's stated nondiscriminatory reason for the alleged adverse employment actions in this case and whether those reasons were a pretext for discrimination.

feeder manager in 2004-2005.  Joe Dooley held the position from March 2006 through March

2007.  Allen Kirby held the position from March 2007 through March 2008.  Joe Dooley has

held the position since March 2008.  The feeder manager reports to the Kansas Feeder Division

Manger, who was Guy Albertson from 2004 or 2005 until June 2006; Jeff Czernicki from June

2006 to October 2007, and Ernie Christie since October 2007.

Plaintiff worked the night dispatch window from October 1999 through approximately

2004.  In approximately 2005, plaintiff was offered and accepted the cover dispatch specialist

assignment.  Her job classification and grade did not change, but she now filled in for absences

and vacations on the other dispatch windows, not just the night window, and covered the part-

time supervisor at the railyard.  However, plaintiff did not cover the twilight window.  She

performed some of the twilight duties from time to time, but never covered absences or vacations

on the twilight window without supervision.  At some point, plaintiff expressed to Kansas

District Human Resources Manager Gary Liberti her preference for working as a cover

dispatcher, instead of night dispatcher.  In 2008, plaintiff expressed her preference to not work

on holidays to her then-supervisor, Kirby.[32]

In 2004 or 2005, plaintiff received one week of training on the twilight dispatch window

from Jim Yankovich, the twilight dispatcher.  After plaintiff began this training, feeder division

manager Albertson decided that the twilight dispatch window could only be covered by a full-

time supervisor when the regular supervisor who worked that shift was absent or on vacation.

Albertson made this decision because he believed that it would reduce the risk of serious service

failures during what he believed was the busier and more complex twilight window.  Therefore,

---

[32]Plaintiff also cited to an excerpt from Dooley's deposition transcript for the proposition that she told
Dooley that she would prefer not to work on weekends and holidays; however, the page numbers cited were not
attached to Doc. 100, Ex. 38.

UPS did not allow plaintiff to continue training on the twilight window.  Plaintiff testified that, despite receiving training on the twilight window, she could not perform all of the twilight dispatch duties without assistance or without further training.

In 2006, plaintiff began covering the night dispatch window again after the regular night dispatcher was discharged until late 2006 or early 2007.  Beginning in October 2007 until July 2008, plaintiff again covered the night window.  Dooley did not believe when he became the James Street feeder manager in March 2008 that there was an assigned cover dispatcher even though plaintiff's time sheets reflected that she was covering the night window during this period.  He believed that plaintiff was the night dispatcher and that he had a designated day dispatcher and  twilight dispatcher.  Dooley testified he would assign full-time supervisors to cover absences and vacations on the dispatch windows.

On July 9, 2008, Dooley and Christie promoted Jason Isabell from yard control supervisor to dispatch specialist.[33]  Isabell became the cover dispatch specialist and covered all three windows, including the twilight window.  Dooley and Christie believed Isabell could cover all three dispatch windows, including the twilight window.  Isabell's promotion occurred while plaintiff was on vacation.

UPS does not post full-time supervisory job positions that are open that UPS is looking to fill or promote into.  Instead, these are made known to employees through "career discussions" and word of mouth.  In 2005, UPS began using the Management Assessment and Promotion Process ("MAPP") to fill open management positions.  Under the MAPP process, employees are

---

[33]Plaintiff testified that UPS had interviewed one female for the open dispatch specialist position, Cindy Holt, who currently worked in the package center.  Plaintiff's testimony about what Holt told her happened at the interview and what Dooley said to Holt is hearsay; the Court sustains defendant's hearsay objection.  In fact, Dooley's statements are double-hearsay.  Because they are inadmissible, the Court will not consider them.

required to submit a letter of interest to Human Resources each year in order to apply for a promotion.  In 2005 and 2006, plaintiff submitted letters of interest to Human Resources, seeking promotion to a full time supervisor position.  Plaintiff received letters back from the Human Resources Manager, explaining that he had received plaintiff's letter of interest, that the next step in the process would be a series of assessments, and that her supervisor or manager would contact her with further details.  UPS has no record of receiving Haynes' promotion assessment for plaintiff in 2005 and Dooley did not fill out a promotion assessment for plaintiff in 2006.  Plaintiff did not receive any follow-up from management or Human Resources about the status of her promotion applications in 2005 and 2006.

The letters sent to plaintiff in response to her letters of interest also state: "As a reminder, letters from candidates interested in a management position expire annually on December 31.  To maintain eligibility, you must submit a new letter each year."[34]  If an employee submits a letter of interest for promotion but does not successfully complete the MAPP process and receive a promotion that year, she must submit a new letter of interest the following year and complete the MAPP process to be eligible for promotion.  In 2007, plaintiff's then-supervisor Kirby approached plaintiff with an envelope that was addressed to Dooley that enclosed the next step of assessments from the previous year promotion process.  Plaintiff explained to Kirby that this was an old packet of application materials and that she would not be submitting a letter of interest or applying for a promotion at the end of 2006, as she believed it would be futile in light of not receiving a promotion in 2005 and 2006.

On July 31, 2008, plaintiff met with Liberti.  Plaintiff had asked to meet with Liberti to

---

[34]Doc. 100, Ex. 10;

15

express her concerns about being removed from the cover dispatch position, without warning, while she was on vacation, while Isabell was promoted to a full time dispatch specialist position and the cover dispatch assignment.  Plaintiff believed she should have been allowed to continue as a cover dispatch specialist and Isabell should have been assigned the night dispatch window shift.

Plaintiff further asked Liberti for clarification about the promotion process and whether the managers were obligated to follow up with an employee who had submitted a letter of interest in the MAPP.  Plaintiff complained about not being allowed to complete training on the twilight window.  She further stated that she felt that Dooley's removal of her from the cover position was in retaliation for a complaint she made in 2006 to Human Resources about an incident where Dooley came to her home to ask her to work an extra shift.  During this July 31, 2008 meeting, Liberti asked plaintiff a series of questions about her job responsibilities.  After plaintiff answered his questions, he asked her, "Well, why isn't your job classified as an MIP position?"  Plaintiff responded, "I don't know, Gary, you tell me."  Then, Liberti told plaintiff that he would meet with Dooley and Christie and then follow up with her.  Plaintiff filled out an intake questionnaire with the EEOC in August 2008.  No one followed up with plaintiff about her July 31, 2008 meeting.

Plaintiff filed her first EEOC/KHRC charge against UPS on November 21, 2008.  After plaintiff's EEOC charge was filed, she noticed a significant decrease in business communication from Dooley.  However, she does not recall any of her managers ever refusing to speak with her or meet with her when she asked to speak or meet with them.  Plaintiff admits that this decrease in communication had no effect on her job performance.

Plaintiff met with Dooley on February 18, 2009.  Dooley told plaintiff that he had heard

16

that she filed an EEOC complaint and they discussed plaintiff's EEOC questionnaire, which she provided to Dooley at the meeting. Dooley asked plaintiff questions about the allegations she made in that questionnaire. Dooley then spoke to plaintiff about the need to properly record her time.

Later in February 2009, Liberti and Brad Williams met with plaintiff. At this meeting, Liberti told plaintiff either that he told Dooley to follow up with her about Isabell's cover dispatch promotion, or that he had spoken with Dooley about the subject. Liberti told plaintiff that he understood she had concerns and plaintiff provided him with a copy of her EEOC questionnaire. Liberti read over the questionnaire and was slapping the document in his hand during the meeting. At one point, Liberti asked "Do you want me to get the EEOC down here?" Liberti also talked to plaintiff during this meeting about how she needed to document her start and finish times, as well as her meals and breaks, because there had been some discrepancies. In the month before this meeting, UPS audited the time records of plaintiff and other employees who UPS suspected were not accurately reporting their start and finish times, and discovered some discrepancies between the start and finish times that were recorded, and the information on surveillance cameras. According to plaintiff, she was often forced to work without taking a break or lunch, so this would effect the time of day she left.

Plaintiff filed a second EEOC/KHRC charge in April 2009.

UPS has salary administration guidelines which set forth detailed procedures for determining starting pay and raises for full time specialists and supervisors. There are different salary grades and ranges for supervisors and specialists; the guidelines are premised upon an employees' job classification. Plaintiff's salary as a dispatch specialist depended in part on her pay rate in her previous job at UPS. Plaintiff received a yearly salary increase every year

17

between 2006 and 2009.  As a dispatch specialist, plaintiff's raise each year was determined by

the feeder division manager based on the salary administration guidelines.  Plaintiff was paid

less than supervisory employees, and she was not eligible for and did not receive stock through

the Management Incentive Program ("MIP").

Jim Yankovich, Scott Wetschensky, Steve Stuke, Nick Sloan and Dennis Smith were full

time feeder supervisors at UPS between 2006 and 2009 and had higher salaries between 2006

and 2009 than plaintiff.  These individuals had all been full-time supervisors for several years

and had worked as feeder supervisors in the larger feeder operation at UPS' Lenexa, Kansas

facility.  Wetschensky, Stuke, and Sloan worked as feeder on-road supervisors between 2006 and

2009.  On-road supervisors train, supervise and evaluate drivers. They perform safety and

training rides with drivers and attend driver training school. They are required to have DOT

cards and commercial drivers' licences.  Specialists do not have these duties or requirements.[35]

Yankovich and Smith worked as dispatchers on the twilight shift at James Street for several

years and had been dispatchers in the Lenexa Feeder Department, which was a larger and more

complex feeder department than James Street.

UPS provides a copy of its Code of Business Conduct ("Code") to all employees.  UPS

employees receive the Code after they are hired.  Plaintiff reviewed the entire Code when she

received it from UPS.  UPS policies require employees to report known or suspected illegal or

unethical conduct, including discrimination.  Plaintiff produced two different versions of the

Code which she received from UPS, a 2002 edition and a 2004 edition.  Both versions contain a

similar disclaimer that the Code is not a contract.  The 2004 Code provides, for example:

---

[35]Plaintiff's objection to this fact is overruled and denied.  William's and Dooley's declarations on this
point are neither subjective nor speculative.  They simply recite the work histories for these individuals.

> The Code is not an express or implied contract of employment and
> does not create any contractual rights of any kind between UPS
> and its employees. In addition, all employees should understand
> that the Code does not modify their employment relationship,
> whether at will or governed by contract. This Code is intended to
> clarify each employee's existing obligation for proper conduct.
> UPS reserves the right to amend, alter, or terminate the Code or the
> policies at any time for any reason. The most recent version of this
> manual may be found on the Corporate Compliance Web site and
> on www.ups.com.[36]

Plaintiff never told anyone in management or Human Resources that she thought the Code was a

contract and no one in management believed that it was a contract.

The Code also contains a Statement of Policy, which provides that each employee has the

responsibility to report to the company violations of the law or UPS' business standards:

> each employee's responsibility to report to the company any
> situation where our standards or the laws are being violated. Any
> employee disclosing, in good faith, violations or suspected
> violations of legal requirements or UPS business standards will not
> be subjected to retaliation or retribution. Likewise, failure to
> comply with the provisions of the [Code] will not be tolerated.[37]

Plaintiff reviewed the entire Code when she received it from UPS.  Plaintiff and all other UPS

employees were repeatedly told that they were obligated to comply with the Code, including the

reporting and non-retaliation provisions.  Plaintiff believed that the Code formed a contract

between her and UPS.  She relied on the representations in the Code that she was required to

report and that she would not be retaliated against for doing so when she complained of

discrimination.

UPS also presented plaintiff with a document entitled Professional Conduct and Anti-

Harassment Policy ("Policy"), which prohibits harassment by UPS and its employees, and states

---

[36]Doc. 92, Ex. AS at 32.

[37]Doc. 92, Ex. AW at UPS3050RD.

19

that harassment on the basis of age or sex is a form of unlawful discrimination.  Plaintiff signed

this document and returned it to UPS.  The Policy states that an employee who believes that she

may be subject to objectionable conduct must report it immediately and that such employee will

not be adversely affected or retaliated against.  It further states that, in response to such a

complaint, UPS will conduct a prompt and thorough investigation.

**IV.    Discussion**

The parties vehemently dispute the scope of plaintiff's claims of discrimination in this

case; primarily, the extent to which the discrimination claims under the ADEA, Title VII,

KAAD, and KADEA encompass wage discrimination claims.  The Court must determine the

extent of plaintiff's claims before it is able to consider the merits of the summary judgment

motion.  The Court observes that plaintiff's claims do appear to be a moving target, even within

the response memorandum.  This is evidenced by her discussion of pretext prior to any

elucidation of exactly what adverse employment actions she claims to have been subjected to.

For example, plaintiff discusses a failure to train claim, yet argues that the adverse employment

action that is associated with this claim occurred years later when she was reassigned from her

cover dispatch position.

In order to determine plaintiff's claims in this matter, the Court turns to the Pretrial

Order, which superseded the prior pleadings.[38]  Plaintiff states her contentions in the Pretrial

Order as follows:

> based on her sex and/or age, she was continuously and repeatedly
> discriminated against and denied promotional, job placement or
> assignment, training, and other opportunities and with respect to
> the terms, conditions, and privileges of her employment.  Ms.

---

[38]Doc. 84 at 1; *see Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474 (2007).

> Daniels also alleges she was unlawfully retaliated against for reporting such and engaging in related protected conduct. Further, Ms. Daniels alleges that, on the basis of her age and/or sex/gender, she has been discriminated against with respect to her job classification, pay, and other economic opportunities and benefits. Additionally, Ms. Daniels alleges that Defendant, through its related conduct, has breached and failed to comply with its related written agreements, obligations, and promises, as set forth in the Code.[39]

In plaintiff's list of her theories of recovery, she sets forth the elements of a standard disparate treatment claim of discrimination, as well as the elements of a wage discrimination claim. The Pretrial Order "'measures the dimensions of the lawsuit,' and 'control[s] the subsequent course of the action unless modified by a subsequent order.'"[40]

Rather than discuss the Pretrial Order, defendant focuses on the Amended Complaint. Defendant contends that plaintiff has alleged sex and age discrimination claims on the following grounds: (1) failure to promote in 2005 and 2006, (2) denial of training in approximately 2004 or 2005, and (3) removal from the cover dispatch specialist position in July 2008.[41] Plaintiff disputes defendant's characterization, and the Court has identified four possible theories of relief set forth in her response: (1) failure to promote, (2) discriminatory job classification, (3) denial of training, and (4) removal from the cover dispatch specialist position in July 2008. The Court finds that these four claims are found within the allegations and statements of claims in the Pretrial Order and proceeds to consider defendant's summary judgment motion in light of these

---

[39]Doc. 84 at 7.

[40]*Shaub v. Newton Wall Co/UCAC*, 153 F. App'x 461, 464 (10th Cir. 2005) (quotation omitted); Fed. R. Civ. P. 16(d).

[41]Defendant denies that plaintiff properly asserted a claim of wage discrimination based on her job classification, primarily relying on the Amended Complaint, which has been superseded. Defendant did address this purported claim on the merits, however, out of an abundance of caution.

21

claims.  While it is unclear whether plaintiff asserts a stand-alone claim based on removal from the cover dispatcher position in July 2008, the Court proceeds to consider it out of an abundance of caution.  As explained more fully below, the Court finds that plaintiff's failure to promote and denial of training claims are untimely.  Summary judgment is granted with respect to plaintiff's job classification and shift reassignment claims on the merits.

### A.     *Timeliness of Discrimination Claims*

Defendant argues that summary judgment is appropriate on the discrimination claims because plaintiff did not file a timely charge of discrimination.  Defendant argues that the failure to promote claim accrued in 2005 and 2006 and the denial of training claim arose in 2004 or 2005.  Because plaintiff did not file her charge of discrimination within 300 days of these discrete employment actions, defendant argues that they are not timely.  Plaintiff contends in the response that the promotion and denial of training claims accrued in July 2008.  She also contends that the job classification and denial of training claims are based on a continuous pattern of discrimination that occurred with each paycheck.

The Supreme Court has held that "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."[42]  The Tenth Circuit has distinguished between a plaintiff's failure to exhaust administrative remedies, which creates a jurisdictional bar to suit, and plaintiff's failure to timely exhaust administrative remedies, which is an affirmative defense subject to equitable tolling.[43]

As a general rule, an administrative charge must be filed with the EEOC within 180 days

---

[42]*Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).

[43]*Jones v. Runyon,* 91 F.3d 1398, 1399 n.1 (10th Cir.1996).

of the occurrence of the alleged unlawful employment practice.[44]  But if a complainant "institutes

proceedings with a state or local agency with authority to grant or seek relief from the practice

charged, the time limit for filing with the EEOC is extended to 300 days."[45]  Generally, "[t]he

EEOC charging period is triggered when a discrete unlawful practice takes place."[46]

Termination, failure to promote, denial of transfer, or refusal to hire are considered "discrete

acts."[47] The Tenth Circuit has held that a discrete act accrues on "the date the employee is

notified of an adverse employment decision by the employer."[48]  "An employee receives notice

of an 'adverse employment decision when a particular event or decision is announced by the

employer.'"[49]  "[N]otice or knowledge of discriminatory motivation is not a prerequisite for a

cause of action to accrue . . . [o]n the contrary, it is knowledge of the adverse employment

decision itself that triggers the running of the statute of limitations."[50]  It is not necessary for an

employee "to know all of the evidence upon which he will ultimately rely at trial in order to file

a charge with the EEOC,"[51] and in fact, the purpose of the EEOC charge is to "initiate the

---

[44]*See* 42 U.S.C. § 2000e-5(e)(1).

[45]*EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 110 (1988).

[46]*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

[47]*Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003) (quoting *Nat'l R.R. Passenger Corp.*, 536 U.S. at 114).

[48]*Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1187 (10th Cir. 2003) (quoting *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)).

[49]*Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1206 (10th Cir. 2007) (quoting *Hulsey*, 43 F.3d at 557).

[50]*Davidson*, 337 F.3d at 1187 (quoting *Hulsey*, 43 F.3d at 558–59); *Clark v. Yellow Transp., Inc.*, No. 07-2072-JPO, 2009 WL 2710196, at *7 (D. Kan. Aug. 25, 2009).

[51]*Davidson*, 337 F.3d at 1188.

23

process of uncovering" the facts surrounding the adverse employment action.[52]  And when a

plaintiff asserts multiple claims of discrimination "based on discrete discriminatory acts, the

limitations period will begin to run for each individual act from the date on which the underlying

act occurs."[53]  Therefore, the Court addresses whether each of plaintiff's claims are timely.

## 1.      Failure to Promote

Plaintiff claims that she was not promoted in 2005 and 2006 because of her age and/or

sex.  She suggests that she does not allege a traditional failure to promote claim, but a distinct

claim of  discrimination because UPS failed to properly process her promotion applications in

both instances.  The Court gleans no appreciable difference in these claims.  They both constitute

a decision not to promote plaintiff to a full-time supervisor position in 2005 and 2006.  The fact

that defendant did not consider her applications, or that it did not properly process her

applications, is evidence of her discrimination claim, not a claim unto itself.  While such

evidence would certainly be probative of pretext under a merits analysis, pretext is not at issue

when considering whether a charge was timely filed.  Plaintiff argues that her promotion claims

did not accrue until July 31, 2008, when she was notified by Liberti that the promotion

applications in 2005 and 2006 were not processed properly.  Plaintiff contends that this is when

she first became aware of the adverse employment decision on her failure to promote claims.

It is undisputed that plaintiff understood she had not been promoted by at least 2007,

when Kirby asked her if she would be applying for the 2007 promotion process.  She responded

to Kirby that applying in 2007 would be futile in light of not receiving promotions the previous

two years.  The MAPP policies and the Human Resources Managers' responses to her letters of

---

[52]*Hulsey*, 43 F.3d at 558.

[53]*Davidson*, 337 F.3d at 1185.

interest make clear that the promotion applications expire at the end of the calendar year and that she was required to resubmit her letter of interest the following year to be considered again. Indeed, plaintiff applied for a promotion in 2006, apparently understanding that she was not promoted the prior year.  Plaintiff argues that she was not made aware of the full extent of the adverse employment decisions until she was provided with additional information during the July 31, 2008 meeting with Liberti that the applications had not been processed properly and that the managers' feedback had not been submitted.  While there is a genuine issue of fact about whether Liberti told plaintiff at this meeting that her promotion applications were not processed properly, there is no genuine issue of material fact that plaintiff was aware that she was not promoted by at least 2007.

UPS' decisions not to promote plaintiff were clearly discrete employment acts that occurred in 2005 and 2006 and it is uncontroverted that plaintiff was aware of the decisions not to promote her in both instances more than 300 days before she filed her administrative charge in November 2008.  Because these decisions constitute discrete acts of discrimination, plaintiff's notice of these decisions triggered the running of the statute of limitations.  Whether the gravamen of this claim is the decision not to promote, or the failure to process her applications, plaintiff was made aware that she did not receive those promotions by at least 2007.  Under clear Supreme Court and Tenth Circuit precedent, these claims accrued at the time she became aware of the decisions not to promote her, not at the time that she became aware of all of the facts in support of her claim.  The Tenth Circuit has made clear that a plaintiff need not have all of the evidence necessary to make her case in order for the charging period to be triggered.[54]  The

---

[54]*Id.* at 1188 (quoting *Hulsey*, 43 F.3d at 558); *Hulsey*, 43 F.3d at 559 (explaining that it is not necessary for the claimant to possess all of the evidence upon which the claim of discrimination relies in order to file a charge with the EEOC).

purpose of the EEOC charge is to begin the process of uncovering such evidence.  Plaintiff had

knowledge of the adverse employment action by at least 2007.  Because plaintiff's failure to

promote claims accrued more than 300 days before plaintiff filed her charge of discrimination,

summary judgment is granted.

## 2.    Denial of Training

Plaintiff contends that her failure to train claim did not accrue until she was removed

from the cover dispatcher position in July 2008, thus, her charge of discrimination was timely

filed in November 2008.  Plaintiff urges that she suffered continuous discrimination that accrued

with each paycheck, rendering her claims timely.  Plaintiff appears to conflate three distinct

issues: when plaintiff's denial of training claim accrued, what was formerly known as "the

continuing violation theory," and the impact of the Lilly Ledbetter Act on her claims.  The Court

addresses these issues in turn and finds that none apply to plaintiff's denial of training claim in

this case.

### a.    Accrual

Plaintiff first argues that her failure to train claim did not accrue until she was removed

from her cover position in July 2008.  She contends that she was removed from this position due

to her lack of experience; had she been provided with the appropriate training as similarly

situated individuals were, she would not have been removed from the cover position.  Again, the

law is clear that a discrimination claim does not accrue when the full effects of a discriminatory

act occurs, it is the discrete act itself that triggers the statute of limitations.[55]  In this case, the

discrete act constitutes the denial of training, not the decision to remove plaintiff from the cover

---

[55]*Davidson*, 337 F.3d at 1188; *Hulsey*, 43 F.3d at 559.

position.  Plaintiff repeatedly contends that removal from the cover position was the effect of the failure to train.  Again, plaintiff appears to conflate her evidence of pretext, which comes into play only on the merits, with the adverse employment actions that her claims are premised upon. Plaintiff claims that UPS discriminated against her by failing to provide her with a training opportunity that would qualify her for a promotion, or would have eventually prevented her removal from the cover position in July 2008.  Therefore, the accrual date is the date that the training was denied, 2005 at the latest, not the date that plaintiff felt the full impact of that decision.

**b.    Discrimination in Compensation**

Plaintiff contends that she suffers from continuing and ongoing discrimination. The continuing violation doctrine was abrogated by the Supreme Court in *National R.R. Passenger Corp. v. Morgan*,[56] for claims against discrete acts of discrimination.  "[U]nexhausted claims involving discrete employment actions are no longer viable,"[57] and may not be asserted under a "continuing violation" theory.[58]  Therefore, "[a] party may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances."[59]

Plaintiff's response urges that her claims should be construed as claims of discrimination in compensation, therefore, they are not discrete acts of discrimination subject to the timeliness requirement set forth in *Morgan*.  Instead, plaintiff argues that the Lilly Ledbetter Fair Pay Act

---

[56]536 U.S. 101 (2002).

[57]*Id.*

[58]*Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003)  (citing *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1184 (10th Cir. 2003)).

[59]*Schroder v. Runyon*, 1 F. Supp. 2d 1272, 1274 (D. Kan. 1998) (quoting *Harrell v. Spangler, Inc.*, 957 F. Supp. 1215, 1219 (D. Kan. 1997)).

of 2009 ("FPA") applies to her claims and the statute of limitations accrued with each

discriminatory paycheck she received.  The FPA was passed in response to the United States

Supreme Court's 2007 decision in *Ledbetter v. Goodyear Tire & Rubber Co.*,[60] which held that

an employer's decision with respect to setting pay is a discrete act of discrimination and the

relevant period of limitations begins to run when the act first occurs.[61]  The FPA amended 42

U.S.C. § 629(d)(3) of the ADEA and 42 U.S.C. § 2000e-5(e)(3)(A) of Title VII by adding the

following subparagraph, defining when an unlawful practice "with respect to discrimination in

compensation" "occurs" for purposes of triggering the administrative filing period:

> (3) For purposes of this section, an unlawful practice occurs, with
> respect to discrimination in compensation in violation of this
> chapter, when a discriminatory compensation decision or other
> practice is adopted, when a person becomes subject to a
> discriminatory compensation decision or other practice, or when a
> person is affected by application of a discriminatory compensation
> decision or other practice, including each time wages, benefits, or
> other compensation is paid, resulting in whole or in part from such
> a decision or other practice.

Congress's purpose in passing the FPA was to reverse the Supreme Court's *Ledbetter*

decision which, in Congress's view, unduly restricted the time period in which victims of wage

discrimination could seek relief.[62]  The FPA does not apply to unlawful practices that do not

constitute "discrimination in compensation."   The plain language of the statute, the legislative

history, and the case law all support the conclusion that unless the claim involves a

discriminatory compensation decision or a hostile work environment, a discrete discriminatory

act is an immediately actionable unlawful employment practice upon which an administrative

---

[60]550 U.S. 618 (2007).

[61]*Id.* at 621.

[62]42 U.S.C. §2000e-5, note (as amended by FPA § 2).

28

charge must be filed within 180 or 300 days.[63]  The FPA did not overturn *Morgan*.[64]

The District of Columbia Circuit Court of Appeals has explained the meaning of

"discrimination in compensation" under the FPA as follows:

> [I]n employment law the phrase "discrimination in compensation"
> means paying different wages or providing different benefits to
> similarly situated employees, not promoting one employee but not
> another to a more remunerative position.  In contrast, a
> discriminatory failure to promote is actionable regardless whether
> it affects an employee's compensation. In context, therefore, we do
> not understand "compensation decision or other practice" to refer
> to the decision to promote one employee but not another to a more
> remunerative position.[65]

Of course, many employment decisions have some later effect on pay, even if they are not pay

setting decisions. "But to include these myriad employment decisions within the 'other practice'

language of the FPA would weaken Title VII's administrative exhaustion requirement. . . . [and]

would potentially sweep all employment decisions under the 'other practice' rubric."[66]  The

Court finds that plaintiff's denial of training claim is a discrete discriminatory act, not a

"discrimination in compensation" decision that alleges different wages or benefits to similarly

situated employees.  Instead, plaintiff essentially claims that the discriminatory act caused her

<u>not</u> to be similarly situated to individuals who were promoted or given a preferable shift

---

[63]*See* H.R. Rep. No. 110-237 (2007); *Almond v. Unif. Sch. Dist. No. 501*, 749 F. Supp. 2d 1196, 1209–15
(D. Kan. 2010) (discussing legislative history and post-*Ledbetter* case law); *see also Noel v. Boeing Co.*, 622 F.3d
266, 272–75 (3d Cir. 2010); *Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370, 375 (D.C. Cir. 2010); *Tillman
v. S. Wood Preserving of Hattiesburg, Inc.*, 377 F. App'x 346, 350 n.2 (5th Cir. 2010); *Russell v. County of Nassau*,
696 F. Supp. 2d 213, 226–29 (E.D.N.Y. 2010); *Tryals v. Altairstrickland, LP*, No. H-08-3653, 2010 WL 743917, at
*7 (S.D. Tex. Feb. 26, 2010); *Rehman v. State Univ. of N.Y. at Stony Brook*, 596 F. Supp. 2d 643, 651 (E.D.N.Y.
2009); *Speer v. Mountaineer Gas Co.*, No. 5:06CV41, 2009 WL 2255512, at *7 (N.D. W. Va. July 28, 2009).

[64]*Noel*, 622 F.3d at 275.

[65]*Schuler*, 595 F.3d at 374–75.

[66]*Noel*, 622 F.3d at 275.

29

assignment.  Denial of training is a discrete act that is governed by *Morgan*, not by the FPA.[67]

Plaintiff claims that if she had been provided with certain training, she would may have been

eligible for promotions that would have led to higher pay and benefits.  This is not a pay-setting

decision, but instead, a discrete discriminatory act that merely could have had an ultimate effect

on pay.  Like plaintiff's failure to promote claim, this claim triggered the administrative clock at

the time plaintiff became aware of the adverse employment action, in either 2004 or 2005 when

her training was cut short, which was more than 300 days before her administrative charge was

filed.

### 3.  Job Classification

Plaintiff explains she was discriminated against when UPS classified her job as a

dispatch specialist instead of a supervisor, which "resulted in her being unlawfully denied

greater pay and benefits, the negative effects of this are continuous and ongoing and realized

each time she received a discriminatory paycheck and was denied related benefits, and this is a

violation of Title VII and the KAAD."[68]  The Court construes this claim as a discrimination in

compensation decision that is subject to the FPA.  Plaintiff's job classification claim, unlike her

failure to promote and failure to train claims, is not based on a discrete employment action.

Instead, her claim is based on the allegation that her job was intentionally classified as a dispatch

specialist position, rather than as a supervisor, because of her sex and/or age in order to avoid

paying her a higher salary and benefit compared to similarly situated male and younger

---

[67]Indeed, *Morgan* considered, among other discrete acts of discrimination, a denial of training claim.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (finding only wrongful suspension, denial of training, and false accusation claims occurred within the 300 days prior to the plaintiff's EEOC charge and all prior discrete acts were untimely).

[68]Doc. 100 n.4.

30

employees.  The gravamen of this claim is that the mis-classification was designed to be a hidden

compensation decision, of the kind envisioned by Congress when it passed the FPA

amendments.  She alleges that she routinely performed supervisory duties, despite her job

classification as a dispatch specialist, resulting in lower pay and benefits compared to similarly

situated males who were classified as supervisors.  The Court finds, therefore, that this claim was

timely filed and will consider it as a claim of salary discrimination under Title VII, the ADEA,

and their Kansas law statutory counterparts.

**4.      Removal from Cover Dispatch Specialist Position**

Plaintiff argues that she suffered discrimination when she was removed from the cover

dispatch position in 2008.  Because there is no dispute that this assignment occurred in July

2008, plaintiff filed a timely charge of discrimination with regard to that claim in November

2008.

The Court, therefore, proceeds to consider the merits of plaintiff's shift reassignment and

job classification discrimination claims.

**B.      *Reassignment Discrimination Claim***

Title VII makes it an unlawful practice for an employer "to deprive any individual of

employment opportunities . . .because of such individual's. . . sex."[69]  The ADEA makes it

unlawful for an employer "to fail or refuse to hire or to discharge any individual with respect to

his compensation, terms, conditions, or privileges of employment, because of such individual's

age."[70]  Plaintiff has not come forward with direct evidence of sex or age discrimination, so the

Court evaluates her claims under the burden-shifting framework of *McDonnell Douglas Corp. v.*

---

[69]42 U.S.C. § 2000e-2(a)(2).

[70]29 U.S.C. § 623(a)(1).

31

*Green.*[71]  Under *McDonnell Douglas*, plaintiff initially bears the burden of production to

establish a prima facie case of discrimination.[72]  To establish a prima facie case of age or sex

discrimination, plaintiff must show that (1) she is a member of a protected class; (2) she suffered

an adverse employment action; and (3) the challenged action took place under circumstances

giving rise to an inference of discrimination.[73]  If plaintiff establishes a prima facie case, the

burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions.[74]  If

defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to plaintiff to

present evidence from which a jury might conclude that defendant's proffered reason is

pretextual, that is, "unworthy of belief."[75]

Defendant maintains that plaintiff did not suffer an adverse employment action when she

was reassigned from the cover dispatcher position in July 2008.  The parties dispute whether

plaintiff was working as a cover dispatcher at the time.  Defendant maintains that she was

working as the night dispatcher, pointing to Dooley's testimony.  Plaintiff maintains that she was

merely covering the night dispatch window, pointing to her own testimony as well as time

---

[71]411 U.S. 792, 802-05 (1973); *Sanders v. S.W. Bell Tele., L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008) (applying *McDonnell Douglas* to both sex and age discrimination claims).

[72]*McDonnell Douglas*, 411 U.S. at 802.

[73]*EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 & n.5 (10th Cir. 2007) (discussing how elements of prima facie case in discrimination cases vary depending on context.  In the Tenth Circuit, it is clear that the prima facie case no longer requires a "similarly-situated person" comparison. *See Sorbo v. UPS*, 432 F.3d 1169, 11173 (10th Cir. 2005).

[74]*Id.*; *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).

[75]*Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).  The Court addresses plaintiff's Title VII and ADEA claims together with her claims under the KAAD and the KADEA.  "Federal decisions applying Title VII are persuasive authority in construing KAAD claims because the statutory schemes are analogous."  *Allen v. Garden City Co-Op, Inc.*, 651 F. Supp. 2d 1249, 1257 n.23 (D. Kan. 2009) (quotation omitted).  Likewise, ADEA and KADEA claims are analogous. *See, e.g.*, *Wood v. City of Topeka*, 90 F. Supp. 2d 1173, 1183 (D. Kan. 2000); *Spicer v. RadNet, Inc.*, No. 10-4024, 2011 WL 2148651, at *6 n.6 (D. Kan. May 31, 2011).

records indicating she was covering for the regular night dispatcher.  Assuming as true that

plaintiff was removed from the cover dispatcher position, defendant argues that this was not an

adverse employment action because plaintiff's job classification and salary did not change.

Furthermore, because plaintiff had been working the night dispatch window for months prior to

Isabell's promotion, defendant urges there was no change in her shift in July 2008.

In order to constitute an adverse employment action, "the employer's conduct must be

'materially adverse' to the employee's job status."[76]  Job duty assignments are neither

automatically actionable nor categorically non-actionable.[77]  Each case must be "'judged from

the perspective of a reasonable person in the plaintiff's position, considering all the

circumstances,'"[78] and the inquiry does not "turn on a plaintiff's personal feelings" about the

circumstances of the case.[79]

The Court assumes for purposes of this determination that plaintiff was in fact removed

from the cover dispatcher position and reassigned to the night dispatch window in July 2008.  It

is undisputed that her job classification as a dispatch specialist remained unchanged, as did her

salary.  There was no job classification at UPS for cover dispatcher, night dispatcher, etc.

Instead, the dispatch specialists were assigned to work one of the three dispatch windows, or as a

cover dispatcher.  Moreover, the undisputed evidence shows that her job responsibilities did not

meaningfully change in July 2008.  The role of cover dispatcher requires the dispatch specialist

to fill in for absences and vacations on the various dispatch widows and plaintiff also covered for

---

[76]*Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1213 (10th Cir. 2003).

[77]*Semsroth v. City of Wichita*, 555 F.3d 1182, 1185–86 (10th Cir. 2009).

[78]*Id.* (quoting *Burlington N. Ry. v. White*, 548 U.S. 53, 71 (2006)).

[79]*Id.*

the part-time supervisor at the railyard. Plaintiff had been covering the night dispatch window since October 2007. Even in her role as a cover dispatcher, while plaintiff was able to perform certain twilight window duties, she was never able to cover the twilight dispatch window unsupervised. Given that plaintiff had been primarily covering the night dispatch window, even if it was in her capacity as the cover dispatcher, her responsibilities did not change in July 2008, when she was merely permanently reassigned to the night dispatch window instead of floating between shifts.

Moreover, plaintiff has not pointed to any evidence to suggest an objective advantage to the cover dispatch position, compared to the night dispatch position. The only evidence about the adverse nature of the reassignment is plaintiff's own subjective feelings that the cover position was preferable. If plaintiff was qualified to cover the twilight dispatch window, this would likely constitute evidence that the cover dispatcher role, as applied to her, was objectively preferable. But the undisputed evidence shows that she was not able to cover the twilight window unsupervised. Therefore, the objective advantages to that assignment for a reasonable person in plaintiff's position is not apparent. The Court finds that plaintiff is unable to establish a prima facie case of discrimination on this claim  because she did not suffer an adverse employment action when she was removed from the cover dispatch assignment and reassigned to work the night dispatch window.


### C.    *Salary Discrimination*

Plaintiff argues that she was discriminated against in her pay under Title VII, the ADEA, and the Equal Pay Act. She maintains that UPS classified her job as a dispatch specialist rather than a supervisor, because of her age and/or sex, resulting in unequal pay between herself and

younger males performing substantially similar work.  Because the standards under the various

statutes differ substantially, the Court addresses her salary discrimination claims separately.

>   **1.**       **Title VII and ADEA**

Under Title VII, the ADEA, and their Kansas law counterparts, the Court applies the

*McDonnell Douglas* analysis to plaintiff's claim because it is based on circumstantial evidence.[80]

In order to establish her prima facie case of discrimination in compensation, plaintiff must come

forward with evidence that she is a member of a protected class and occupies a job similar to that

of higher paid younger males.[81]  If the plaintiff is able to make this showing, then "the burden of

production shifts to the employer to state a legitimate, nondiscriminatory reason for its adverse

employment action."[82]  "If the employer meets this burden, then summary judgment is warranted

unless the employee can show there is a genuine issue of material fact as to whether the

proffered reasons are pretextual."[83]

Defendant argues that there is no evidence to suggest that plaintiff occupied a job similar

to that of higher paid younger males, pointing to the differences in responsibilities between the

jobs of dispatch specialist and full-time supervisor.  Plaintiff responds that she was regularly

performing the duties and had the responsibilities of at least one full-time feeder supervisor.  She

also points to evidence that there are more male than female employees in full time supervisory

and managerial positions.  The parties dispute whether plaintiff in fact performed supervisory

duties on a regular basis.  Plaintiff refers to Haynes deposition testimony that plaintiff performed

---

[80]*Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1311 (10th Cir. 2006).

[81]*Id.*; *Allen v. Garden City Co-Op, Inc.*, 651 F. Supp. 2d 1249, 1257–58 (D. Kan. 2009).

[82]*Mickelson* , 460 F.3d at 1311 (quotation omitted).

[83]*Id.* (quotation omitted).

the duties and had the responsibilities of a full-time supervisor.  Plaintiff also relies on her own

deposition testimony for this fact.  Defendant points to the undisputed facts that plaintiff did not

perform the supervisory duties of training and evaluating other employees, nor was she able to

cover the twilight window without supervision.  In contrast, full-time supervisors have

experience working all three windows and have the added responsibilities of evaluating and

training employees under their supervision.

The Court finds that plaintiff is unable to establish a genuine issue of material fact that

she occupied a job similar to that of higher paid younger or male employees.  Plaintiff compares

her job to the jobs performed by male full-time supervisors in the feeders department.  Plaintiff

and one other dispatcher, Kathleen Carpenter, did perform some supervisory duties such as

giving drivers instructions and orders, being left alone in the office without a supervisor,

delivering packages in their own cars, and supervising administrative assistants. But it is

undisputed that plaintiff did not perform formal supervisory duties in the feeder department, such

as training, disciplining, and evaluating subordinate employees.  Moreover, it is undisputed that

plaintiff was not able to work as a dispatcher on the twilight window, one of three windows that

the feeder supervisors were responsible for.  In fact, the entire basis of plaintiff's untimely

training and promotion claims is that she desired to be promoted to full-time supervisor because

it had more responsibility than her dispatch specialist position, and that she was unable to

perform the twilight window responsibilities because UPS ended her training after one week

because it had determined that only a full-time supervisor could cover that window.  Viewing the

evidence in the light most favorable to plaintiff, while she did perform some of the same

responsibilities as full-time supervisors in the feeder department, there were significant

responsibilities that she did not perform.  Therefore, the Court cannot find that there is a genuine

36

issue of material fact about whether plaintiff occupied a similar position as higher paid, younger or male employees.

Assuming *arguendo*, that plaintiff could establish a prima facie case of discrimination in compensation, the Court would find that she is unable to establish a genuine issue of material fact about whether defendant's stated reasons for the unequal pay are a pretext for age or sex discrimination.  Defendant maintains that the differences in salary are based on the following non-discriminatory reasons: (1) the supervisor position is a higher level position at UPS; (2) different salary ranges and grades apply to supervisor and dispatch job classifications; (3) the job duties, responsibilities, skills and requirements are different; and (4) the salaries depend in part on each employees prior work experience and salaries at UPS.   Because defendant has come forward with non-discriminatory reasons for the pay differential, plaintiff must show that those reasons are merely a pretext for discrimination.

 A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[84] The Court is to look to the facts as they appeared to the person making the decision.[85]  Plaintiff points to the following evidence of pretext on the job classification claim: (1) Liberti asked plaintiff why her job was not classified as supervisory; (2) plaintiff's former manager stated that she was performing supervisory duties; (3) the only supervisors in the feeder department were male.  Plaintiff also presented evidence that Carpenter performed supervisory duties at times.  None of this evidence would allow a reasonable juror to conclude that defendant's stated reasons

---

[84]*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).

[85]*See, e.g.*, *Simmons v. Sykes Enters., Inc.*, –F.3d–, 2011 WL 2151105, at *3 (10th Cir. June 2, 2011).

for classifying plaintiff's job as a dispatch specialist, rather than a supervisor, are pretext for discrimination.  As already discussed with respect to plaintiff's prima facie case, the evidence is undisputed that the dispatch specialist and supervisor positions were dissimilar in terms of responsibilities.

UPS has salary administration guidelines which set forth detailed procedures for determining starting pay and raises for full time specialists and supervisors.  There are different salary grades and ranges for supervisors and specialists.  Furthermore, plaintiff's salary as a dispatch specialist depended in part on her pay rate in her previous job at UPS.  Plaintiff received a yearly salary increase every year between 2006 and 2009.  As a dispatch specialist, plaintiff's raise each year was determined by the feeder division manager based on the salary administration guidelines.  Plaintiff does not dispute that her salary was correct under these guidelines, but instead, relies exclusively on her contention that she performed the same work as full-time supervisors.

While the guidelines are certainly premised upon correctly classifying employees' jobs, the evidence presented by plaintiff does not present a genuine issue of material fact about whether she was performing similar job duties to a full-time supervisor.  Plaintiff points to Haynes deposition testimony, but even Haynes acknowledged important differences between plaintiff's job responsibilities as a dispatcher and those of a full-time supervisor:

> Q. Okay. Well, tell me what -- why do you say that she was doing the job of a full-time supervisor?
>
> A. Well, I could see no difference in her responsibilities other than the only thing that would have separated that from a full-time is the part that discipline, and my specialists are not required to actually do the discipline, that is something that full-time MIP would do.  But other than that, the -- her job requirements and duties on the night sort pretty much mirrored -- other than the

38

amount of volume that she handled, pretty much mirrored the MIP
job on the twilight.

Q. Okay. Except that you said she couldn't discipline employees,
and you testified earlier that the twilight was a busier and more
complicated dispatch window, right?

A. That is correct.

Q. Okay. And that she was not able to actually do the twilight
dispatch window by herself, is that right?

A. That is correct.[86]

It is uncontroverted that dispatch specialists cannot discipline or discharge employees, and are

not held responsible for ensuring training, discipline and evaluations of drivers and various other

employees.  Plaintiff also repeatedly acknowledged that she was unable to work the twilight

dispatch window by herself and was unfamiliar with all of the duties and responsibilities

associated with that window.[87]

These important differences in job duties and responsibilities are not called into question

by plaintiff's evidence of pretext.  Liberti's question to plaintiff during their July 31, 2008

meeting does not suggest, even when viewed in the light most favorable to plaintiff, that her job

was misclassified.  Even if Liberti did believe plaintiff's job was misclassified, this question

does not support an inference that UPS mis-classified her job based on sex or age discrimination.

Finally the Court is unable to find that plaintiff's statistical evidence regarding the

number of female versus male supervisors at the James Street facility is probative of pretext in

this case.  Plaintiff points to evidence that there are no full-time female supervisors or managers

---

[86]Doc. 100, Ex. 14 at 158.  Moreover, Haynes supervised plaintiff for only about one year, in 2004 and
2005.  Haynes does not have any personal knowledge about plaintiff's job responsibilities after 2005.

[87]Doc. 92, Ex. B at 61–62, 67–68, 131, 168, 189, 198–99; *see also* Doc. 27 at 2.

in the James Street feeder department and that, as of July 1, 2008, only thirteen out of fifty-one full-time supervisors and specialists at the James Street facility were female and seven out of forty full-time supervisors were female.  In order to raise an inference of pretext, statistical evidence "must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between comparable individuals."[88]  Here, plaintiff's bare statistics showing the numbers of male and female supervisors and dispatchers at James Street, many of whom do not work in the feeders department, do not tend to show that defendant's nondiscriminatory reasons for the difference in job classification are pretext for discrimination.[89] For all of these reasons, the Court would find no genuine issue of material fact that defendant's stated, nondiscriminatory reasons for the pay differential are not pretext for discrimination based on plaintiff's sex or age.

## 2.  Equal Pay Act

The Court reviews plaintiff's salary discrimination claim under a very different analytical framework on her EPA claim.  Under the EPA, plaintiff must first establish a prima facie case of discrimination "by demonstrating that employees of the opposite sex were paid differently for performing substantially equal work."[90]  If plaintiff meets this burden, the burden of persuasion shifts to the defendant to show that the wage disparity was justified by one of four permissible reasons: "(1) a seniority system; (2) a merit system; (3) a pay system based on quantity or quality

---

[88]*Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 746 (10th Cir. 1991).

[89]The Court also notes that this is not a disparate impact case.  *See, e.g.*, *Thompson v. Weyerhauser Co.*, 582 F.3d 1125 (10th Cir. 1009).  Even in a disparate impact, or pattern or practice case, "it is not the fact of separate genders in departments that is prohibited, it is the deprivation of opportunity or adverse effect on status that is prohibited."  *Marion v. Slaughter Co.*, No. 98-6286, 1999 WL 1267015, at *6 (10th Cir. Dec. 29, 1999).

[90]*Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1311 (10th Cir. 2006).

40

of output; (4) a disparity based on any factor other than sex."[91]   The Tenth Circuit has explained:

> If the employer fails to convince the jury with its evidence of one or more of the "affirmative defenses" the plaintiff will prevail on her prima facie case.  This is not to say that an employer may never be entitled to summary judgment on an EPA claim if the plaintiff establishes a prima facie case.  But, because the employer's burden in an EPA claim is one of ultimate persuasion, in order to prevail at the summary judgment stage, the employer must prove at least one affirmative defense so clearly that no rational jury could find to the contrary.[92]

Defendant argues that plaintiff's EPA claim fails because plaintiff cannot establish a prima facie case.  The "equal work" component of plaintiff's prima facie case is not to be construed broadly.[93]  While the jobs need not be identical, they must be "substantially equal."[94] The Court has already found that plaintiff did not perform similar work to the full-time male supervisors in the feeders department under the Title VII and ADEA analysis.  For the same reasons explained therein, plaintiff is unable to meet the more exacting standard of showing that she performed substantially equal work.  As already detailed in the previous section, the uncontroverted facts show that the differences in job duties and responsibilities between the dispatch specialist position and the full-time supervisor position were significant.  Importantly, dispatch specialists were not responsible for discharging, evaluating, training, or disciplining subordinate employees and full time supervisors were required to cover the twilight window. Plaintiff concedes that she performed none of the duties.  While plaintiff did perform some of the

---

[91]*Id.* (quotation omitted); *see also* 29 U.S.C. § 206(d)(1).

[92]*Id.* (quotations omitted).

[93]*Miller v. Auto. Club of N.M., Inc.*, 420 F.3d 1098, 1119 (10th Cir. 2005), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *Lewis v. D.R. Horton, Inc.*, 375 F. App'x 818, 823 (10th Cir. 2010).

[94]*Lewis*, 375 F. App'x at 823.

same duties as full-time supervisors, she did not perform all of the duties of that job.[95]  Plaintiff

has not made a prima facie case that the jobs were substantially similar; thus, summary judgment

is appropriate on her EPA claim.

### D.      Retaliation

Title VII and the ADEA make it unlawful to retaliate against an employee because the

employee has opposed any practice made unlawful by Title VII or the ADEA, or because the

employee has "participated . . . in an investigation, proceeding or hearing."[96]  In the absence of

direct evidence of retaliation, the court assesses retaliation claims under the *McDonnell Douglas*

burden-shifting framework.[97]  Under this burden-shifting structure, plaintiff must first establish a

prima facie case of retaliation.  If she does so, the burden shifts to the employer to articulate a

legitimate nondiscriminatory reason for the adverse employment decision.  From there, the

burden returns to plaintiff to show that the stated reason is pretextual.[98]

### 1.      Prima Facie Case

The elements of a prima facie claim of retaliation under Title VII and the ADEA are: (1)

the employee engaged in protected opposition to discrimination; (2) the employee suffered an

adverse employment action during or after his protected opposition that a reasonable employee

would have found materially adverse; and (3) a causal connection exists between the protected

---

[95]*See Miller*, 420 F.3d at 1119 (acknowledging that the plaintiff performed some of the duties of jobs that were substantially similar, but finding that because the plaintiff did not perform all of those duties, she was unable to establish her prima facie case under the EPA).

[96]42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d).  The Court applies the same analysis to plaintiff's retaliation claims under their Kansas statutory counterparts.

[97]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Medina v. Income Support Div.*, 413 F.3d 1131, 1135 (10th Cir. 2005).

[98]*Trujillo v. Univ. of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998).

activity and the materially adverse action.[99]

Defendant argues that plaintiff has failed to come forward with evidence that plaintiff suffered an adverse employment action after she complained of discrimination in 2008 and that she has failed to establish a causal connection between her complaint and any adverse employment action.  The antiretaliation provisions in Title VII and the ADEA seek "to prevent employer interference with 'unfettered access' to [the statutes'] remedial mechanisms[] . . . by prohibiting employer actions that are likely to 'deter victims of discrimination from complaining to the EEOC,' the courts, and their employers."[100]  The standard is objective; plaintiff must show that a "reasonable employee would have found the challenged action materially adverse."[101] This "avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine plaintiff's unusual subjective feelings."[102]

In approaching the question of whether an employer's actions were materially adverse, the Tenth Circuit recently explained,

> [W]e are obligated to bear in mind that "Title VII protects individuals 'not from all retaliation' but only from retaliation 'that produces an injury or harm'" that itself rises to a "'level of seriousness.'" *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1087 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)).  To qualify under this standard, we held in *Williams* that a plaintiff must show "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (quoting

---

[99]*Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1201–02 (10th Cir. 2008); *McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006).

[100]*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

[101]*Id.*

[102]*Id.* at 68–69.

43

> *White*, 548 U.S. at 68) (internal quotation marks omitted).
> "Requiring this level of adversity . . . is necessary 'to separate
> significant from trivial harms.'" *id.* (quoting *White*, 548 U.S. at 68),
> "petty slights, minor annoyances, and simple lack of good
> manners," *White*, 548 U.S. at 68. "Otherwise, minor or even trivial
> employment actions that an irritable, chip-on-the-shoulder
> employee did not like would form the basis of a discrimination
> suit." *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1279
> (10th Cir. 2005) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437,
> 441 (7th Cir. 1996)).[103]

Plaintiff argues that she suffered the following adverse employment actions in retaliation for complaining to Liberti of discrimination in July 2008: (1) UPS managers confronted her about recording her time properly, (2) plaintiff suffered a decrease in business communication with Dooley, and (3) Liberti failed to investigate her complaints of discrimination.

### a.     Time Records

Plaintiff contends that the February 2009 meetings with Dooley and with Williams and Liberti, when these managers talked to her about the discrepancies between her time sheets and the surveillance cameras, were adverse employment actions.  Defendant contends that these discussions did not amount to a materially adverse employment action because UPS did not discipline, discharge, or adversely impact plaintiff's employment in any way.  At the February 18, 2009 meeting with Dooley, Dooley spoke to plaintiff about properly recording her time immediately after discussing plaintiff's EEOC questionnaire with her.  Liberti also talked to plaintiff during a subsequent meeting about how she needed to document her start and finish times, as well as her meals and breaks, because there had been some discrepancies.  In the month before this meeting, UPS audited the time records of plaintiff and other employees who UPS suspected were not accurately reporting their start and finish times, and discovered some

---

[103]*Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1216 (10th Cir. 2010).

discrepancies between the start and finish times that she recorded, and the information on surveillance cameras.  According to plaintiff, she was often forced to work without taking a break or lunch, so this would effect the time of day she left.  This conversation took place immediately after a discussion about plaintiff's previous complaints of discrimination.

It is undisputed, however, that no action was taken against plaintiff based on UPS' allegations that she improperly recorded her time.  The Court agrees that these verbal warnings, standing alone, did not adversely impact her employment.[104]  These conversations did not affect her salary, benefits, or working conditions and had no effect on her employment status.[105]  There is no evidence that plaintiff was disciplined beyond these verbal warnings.  There is no objective evidence in the record that such verbal warnings would deter a reasonable employee from complaining about discrimination.

Even if the Court found that plaintiff met her prima facie burden, it would find that there is no genuine issue of material fact on the issue of pretext.  Defendant asserts that it counseled plaintiff about her time records, along with other employees, after conducting an audit, comparing employees' recorded start and finish times with the times recorded on surveillance cameras.  Plaintiff has come forward with no evidence to suggest that this issue was brought to plaintiff's attention for a discriminatory reason, rather than in conjunction with this audit, especially considering her repeated claims that she first complained about discrimination more than six months before these meetings, on July 31, 2008.

**b.    Decrease in Business Communication**

---

[104]*See Steele v. Kroenke Sports Enters., LLC*, 264 F. App'x 735, 746 (10th Cir. 2008) (finding verbal warning without any further discipline did not constitute a materially adverse action).

[105]*See Haynes v. Level 3 Comm'cns, LLC*, 456 F.3d 1215, 1224 (10th Cir. 2006).

45

Plaintiff next claims she suffered an adverse employment action when Dooley decreased his business communications with her during the Fall 2008.  Plaintiff claims that she received fewer emails and voicemails from Dooley after she filed her EEOC charge.  Viewing the evidence in the light most favorable to plaintiff, Dooley did communicate less with her during this period, although he did not entirely stop communicating with her.  The Court is unable to find that this constitutes an adverse employment action.  Instead, this is merely a snub by her supervisor that admittedly did not affect her job performance.[106]  Viewing the evidence in the light most favorable to plaintiff, this decrease in business communication constitutes a petty slight, or minor annoyance; it does not constitute a materially adverse action.

### c.    Failure to Investigate

Finally, plaintiff argues that she was retaliated against when Liberti failed to investigate the internal discrimination complaint she made in July 2008.  First, the Court notes that there is a genuine issue of material fact about whether plaintiff explicitly complained of sex or age discrimination at the July 31, 2008 meeting—Liberti denies plaintiff's testimony that she connected her complaints about the promotion process, her lack of training, and job classification to discrimination on the basis of sex or age.  Assuming that plaintiff did make such a complaint, she has come forward with no evidence to support an inference that Liberti failed to investigate plaintiff's complaints.  Plaintiff has only come forward with evidence that Liberti did not follow up with her after she made her complaint.  Defendant, on the other hand, has produced Liberti's declaration, where he attests that while he never told Dooley that plaintiff had complained to him about discrimination, he did speak to Dooley and Christie about their decision to assign Isabell to

---

[106]*See Steele*, 264 F. App'x at 746.

the cover dispatcher position and plaintiff to the night dispatcher position.  Dooley and Christie told plaintiff that they believed Isabell was more qualified than plaintiff to work as a cover dispatcher because he was able to cover the twilight window.

Even if plaintiff produced evidence to support an inference that UPS failed to investigate her July 31, 2008 complaints, she does not explain how UPS' failure to investigate constituted a materially adverse change in the terms or conditions of her employment.[107]  Indeed, some courts have held that, as a general rule, an employer's failure to investigate a discrimination complaint cannot be considered an adverse employment action that is taken in retaliation for filing the same complaint.[108]  Instead, plaintiff seems to contend that because this fact could support an inference of discrimination at the pretext stage, it should also be sufficient to meet the adverse employment action requirement of her prima facie case.[109]  Even if Liberti did not investigate plaintiff's complaints as discrimination complaints, the evidence shows that he discussed her underlying complaints with Dooley and Christie.

In sum, the Court finds no evidence in the record that, after plaintiff complained of

---

[107]*See Dean v. Boeing Co.*, 195 F. Supp. 2d 1280, 1292 (D. Kan. 2002), *aff'd*, 61 F. App'x 576 (10th Cir. 2003).

[108]*Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) ("an employee's knowledge that her employer has declined to investigate her complaint will not ordinarily constitute a threat of future harm, recognizing, of course, that it would hardly provide a positive incentive to lodge a further challenge."); *Pilgrim v. McGraw-Hill Cos.*, 599 F. Supp. 2d 462, 478 (S.D.N.Y. 2009) (granting summary judgment because plaintiff produced no evidence that a reasonable person would not make a complaint in an exit interview if the employer would not investigate it).

[109]Plaintiff relies on *DeFreitas v. Horizon Management Corp.*, 577 F.3d 1151 (10th Cir. 2009), but this is a case brought under the interference provisions of the Family Medical Leave Act and for religious discrimination under Title VII.  The Court finds no support in this case for the proposition that the failure to investigate an internal complaint constitutes a materially adverse employment action.  Plaintiff also points the Court to *Sassaman v. Gamache*, 566 F.3d 307 (2d Cir. 2009).  There, the Court assumed for purposes of summary judgment that plaintiff could establish her prima facie case.  *Id.* at 312.  The failure to properly investigate the plaintiff's charges of sexual harassment was probative of pretext.  *Id.*  Accordingly, this case provides no support for plaintiff's assertion that the failure to investigate constitutes an adverse employment action.

discrimination to Liberti on July 31, 2008, UPS took any adverse action against her that might have dissuaded a reasonable worker from making or supporting a charge of discrimination.  As such, there is no genuine issue of material fact on an essential element of plaintiff's  claim and summary judgment is appropriate.  "[I]f an employee fails to present even the limited quantum of evidence necessary to raise a prima facie inference that his or her protected activity led to an adverse employment action, it can become pointless to go through the motions of the remainder of the *McDonnell Douglas* framework to determine that unlawful retaliation was not at play."[110]

### E.    *Breach of Contract and Promissory Estoppel Claims*

Plaintiff asserts a breach of contract and promissory estoppel claim based on the Code and the anti-retaliation Policy issued by UPS to its employees, including plaintiff.  Plaintiff maintains that UPS made promises and assurances in these documents that she reasonably relied on and that UPS breached.

Under 28 U.S.C. § 1367(c)(3), the Court may decline to exercise supplemental jurisdiction if it has "dismissed all claims over which it has original jurisdiction."  "Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary."[111]  Such compelling circumstances include "the nature and extent of pretrial proceedings, judicial economy, convenience, and [whether] fairness would be served by retaining jurisdiction."[112]  The Court determines that these considerations weigh in favor of exercising jurisdiction over plaintiff's remaining state law claims.  Exercising jurisdiction is in the best

---

[110]*Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1201–02 (10th Cir. 2008).

[111]*Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995).

[112]*Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 541 (10th Cir.1995) (quoting *Thatcher Enter. v. Cache Cnty. Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990)).

interest of judicial economy and convenience given that the facts on all claims asserted in this case are interrelated.  Moreover, as described more fully below, Kansas law is settled on the principles raised by defendant's motion.[113]

Defendant first argues that plaintiff's common law claims are precluded under the alternative remedies doctrine, which provides that a state or federal statute would be substituted for a state retaliation claim if the substituted statute provides an adequate alternative remedy.[114]  It has been held that the KAAD "provides an adequate and exclusive state remedy for violations of the public policy enunciated therein."[115]  And this reasoning has been extended to the KADEA.[116] Plaintiff's common law claims in this case are based on the same facts that form the basis of her retaliation claims under federal and state law: UPS retaliated against her for complaining of discrimination.  The only distinction between her claims is that she cites the statutes as a source of the violation on the retaliation claims; she cites the Code and the Policy as sources of defendant's violation or breach on the common law claims.

Plaintiff contends that the federal and state anti-retaliation statutes do not provide her with an adequate remedy because they are premised on different obligations and duties, but fails to explain how her claim differs from her statutory retaliation claims.  The factual basis of her claims are identical.  More importantly, plaintiff does not explain how the federal and state statutory remedies are inadequate in this case, other than to suggest they may be inadequate if she

---

[113]*See Ball*, 54 F.3d at 669 (explaining that it is particularly appropriate for courts to defer to the state courts where a state law cause of action is continuing to develop).

[114]*See Polson v. Davis*, 895 F.2d 705, 709 (10th Cir. 1990); *Flenker v. Willamette Indus.*, 967 P.2d 295, 299 (Kan. 1998).  Contrary to plaintiff's characterization of this argument, preemption is not at issue here.  *See Flenker*, 967 P.2d at 299 (explaining the distinction between preemption and preclusion).

[115]*Polson*, 895 F.2d at 709–10.

[116]*Schartz v. Unifed Sch. Dist. No.l 512*, 953 F. Supp. 1208, 12129 (10th Cir. 1997);

cannot prevail.  But this is not the standard.  The standard is whether the statutes provide an adequate alternative remedy.[117]  Plaintiff cites *Flenker* for the proposition that a statutory scheme may not be adequate, but the Kansas Supreme Court determined in that case that, while Title VII provides an adequate remedy for violations of the public policy enunciated therein, OSHA did not provide an adequate remedy because it made no provision for an employee to bring a private action in federal court.[118]  Title VII, and not OSHA, is at issue in this case.

Title VII, the ADEA, the KAAD, and the KADEA all provide an adequate remedy for plaintiff to pursue her retaliation claim in this matter.  Plaintiff's implied contract and promissory estoppel claims are based on the same retaliation that she alleges in her statutory retaliation claims.  "Characteristics of an adequate statutory remedy include ample filing time, limits on the discretion of an administrative official in awarding relief, and an opportunity for the employee to pursue relief after administrative remedies are exhausted."[119]  *Flenker* explicitly referenced Title VII as an adequate statutory scheme.[120]  And, the Court finds that the KAAD and the KADEA are administered by a committee with a carefully stipulated membership composition,[121] plaintiffs are allowed to bring claims within six months,[122] and they provide plaintiffs with the right to bring suits on their own behalf after exhaustion of administrative remedies.[123]  Under these

---

[117]*Polson*, 895 F.2d 709–10; *Flenker*, 967 P.2d at 299.

[118]967 P.2d at 303.

[119]*Chapman v. Atchison Casting Corp.*, No. CIV. 99-2094-KHV, 2000 WL 1469315, at *2 (D. Kan. Sept. 25, 2000).

[120]967 P.2d at 303.

[121]K.S.A. §§ 44-1003(a), 44-1115.

[122]§ 44-1003(i).

[123]*Id.*

circumstances, the Court finds that federal and state antiretaliation statutes all provide plaintiff an adequate substitute for these state common law remedies.

Even if the Court did not find that these claims are precluded, it would grant defendant's motion for summary judgment on the merits.  Kansas generally follows the employment-at-will doctrine, meaning "that, in the absence of an express or implied contract between an employee and employer regarding the duration of employment, either party is free to end the employment at any time for any reason."[124] Plaintiff claims that she entered into an implied-in-fact contract with UPS to refrain from retaliation and investigate any complaints of discrimination, based on the statements in the Code that required plaintiff to report any violations of the Code and the Code's promise that employees will not be retaliated against for making such reports.  Defendant points to the clear disclaimer language in the Code, where it explicitly states that it is not a contract.

The existence of an implied contract "depends on the intent of the parties, divined from the totality of the circumstances."[125]  The existence of a disclaimer in the employee handbook does not determine the issue as a matter of law.[126]  While the existence of an implied contract for employment is normally a question of fact for the jury, summary judgment may be appropriate when the plaintiff fails to present evidence of "'anything above and beyond the terms of the personnel manual.'"[127]  Standing alone, provisions of an employee handbook stating that employees will not suffer adverse action for reporting violations of the handbook are insufficient

---

[124]*Palmer v. Brown*, 752 P.2d 685, 687 (Kan. 1988); *see also, e.g.*, *Foster v. Alliedsignal Inc.*, 293 F.3d 1187, 1192 (10th Cir. 2002) (citing *Morriss v. Coleman Co.*, 738 P.2d 841, 846 (Kan. 1987)).

[125]*Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 537 (10th Cir. 1995).

[126]*Id.* at 538 (discussing *Morriss*, 738 P.2d at 849).

[127]*Id.* (quoting *Farthing v. City of Shawnee, Kan.*, 39 F.3d 1131, 1140 (10th Cir. 1994)).

51

as a matter of law to establish an implied contract of employment.[128]  Plaintiff comes forward with

no evidence other than the Code, defendant's antiretaliation Policy that she signed, and her own

subjective beliefs that there was a meeting of the minds.  This evidence is insufficient, as a matter

of law, to establish an implied contract.

Moreover, even if there was a contract, the Court has already found that defendant did not

breach that contract by violating its promise that a person who reports discrimination "will not be

adversely affected or retaliated against."  As discussed on plaintiff's retaliation claims, she has

not come forward with evidence to establish a genuine issue of material fact as to whether she

suffered an adverse employment action in retaliation for complaining of discrimination.  For all of

these reasons, the Court would grant defendant's motion for summary judgment even if plaintiff's

claim was not precluded by alternative statutory remedies.

Alternately, plaintiff argues that the anti-retaliation provisions in the Code and Policy

created a duty to investigate her discrimination claim and to not retaliate against her.[129]  Plaintiff

identifies no authority under Kansas law that an employee may be entitled to relief under a

promissory estoppel theory based on representations in an employee handbook.  Even if Kansas

did recognize a cause of action under these circumstances, the Court would find summary

judgment appropriate.  To invoke the doctrine of promissory estoppel, plaintiff must come

forward with evidence that the "promise was made under circumstances where the promisor

intended and reasonably expected that the promise would be relied upon by the promisee and

---

[128]*Id.*; *Zwygart v. Bd. of County Comm'rs of Jefferson County, Kan.*, 412 F. Supp. 2d 1193, 1200 (D. Kan. 2006), *aff'd*, 483 F.3d 1086 (10th Cir. 2007); *Litton v. Maverick Paper Co.*, 388 F. Supp. 2d 1261, 1293 (D. Kan. 2005); *see also Brown v. United Methodist Homes for the Aged*, 815 P.2d 72, 83 (Kan. 1991) (finding question of fact when employment at-will language added to manual after plaintiff's employment).

[129]533 F.3d 594 (7th Cir. 2008); *see also Darr v. Town of Telluride, Colo.*, 495 F.3d 1243 (10th Cir. 2007) (applying Colorado law).

further that the promisee acted reasonably in relying upon the promise."[130]  The Court finds that

the disclaimer in the Code is clear evidence that defendants did not intend for the Code to

constitute a promise or contract or agreement.  Furthermore, the Court has already found that

there was no detriment to plaintiff's reliance on this policy, as she suffered no adverse

employment action as a result of her internal complaint of discrimination.

The Court finds the plaintiff's state common law claims are precluded by the

antiretaliation statutes; however, even if these claims were not precluded, it would grant summary

judgment on the merits.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion for

Summary Judgment (Doc. 90) is granted.  Defendant's motions to strike (Docs. 112, 113, 123,

and 124) are granted in part and denied in part consistent with this Order.

Dated: June 24, 2011

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[130]*Patrons Mut. Ins. Ass'n v. Union Gas Sys., Inc.*, 830 P.2d 35, 39 (Kan. 1992).

AO 450 (Rev. 01/09)  Judgment in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Kansas

| | |
|---|---|
| REGINA DANIELS | ) |
| *Plaintiff*(s) | ) |
| v. | ) |
| UNITED PARCEL SERVICE, INC. | ) |
| *Defendant*(s) | ) |

Civil Action No.     09-2304-JAR

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐ the plaintiff *(name)* ___ recover from the defendant *(name)* ____ the amount of ___ dollars ($___), which includes prejudgment interest at the rate of __%, plus post judgment interest at the rate of __%, along with costs.

☒ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant United Parcel Service, Inc. recover costs from the plaintiff Regina Daniels.

☐ other: _____.

This action was *(check one)*:

☐ tried by a jury with _U. S. District Court Judge_____ presiding, and the jury has rendered a verdict.

☐ tried by _U. S. District Court Judge____ without a jury and the above decision was reached.

☒ decided by _U. S. District Court Judge_____ on a motion for summary judgment.

Date:   6/24/11

_____

*TIMOTHY M. O'BRIEN*
*CLERK OF COURT*

s/ Pamela S. Patton

_____

*Signature of Clerk or Deputy Clerk*

Age Discrimination in Employment

29 U.S.C. § 623

§ 623. Prohibition of age discrimination

(a) Employer practices

It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

(3) to reduce the wage rate of any employee in order to comply with this chapter.


(d) Opposition to unlawful practices; participation in investigations, proceedings, or litigation

It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

Ledbetter Fair Pay Act

42 U.S.C.A. § 2000e-5

For purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this subchapter, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.


29 U.S.C.A. § 626

For purposes of this section, an unlawful practice occurs, with respect to discrimination in compensation in violation of this chapter, when a discriminatory compensation decision or other practice is adopted, when a person becomes subject to a discriminatory compensation decision or other practice, or when a person is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

Title VII Discrimination

42 U.S.C. § 2000e–2

§ 2000e–2. Unlawful employment practices

(a) Employer practices

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.


(d) Training programs

It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.

(m) Impermissible consideration of race, color, religion, sex, or national origin in employment practices

Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

Title VII Retaliation

42 U.S.C. § 2000e–3

§ 2000e–3. Other unlawful employment practices

(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.